**ALEXANDER S., Alfred S., Benny B., Christopher M., Lafayette M., and Ricky S., By and Through their Guardian ad Litem, Lesly A. BOWERS, individually and as representatives of a class of juveniles, Plaintiffs,**

v.

**Flora Brooks BOYD, individually and in her official capacity as Director of the Department of Juvenile Justice; Richard E. McLawhorn, individually and in his official capacity as former Commissioner of the Department of Juvenile Justice for the State of South Carolina; John F.**

774

Henry, Frank Mauldin, Kathleen P. Jennings, Joseph W. Hudgens, Karole Jensen and J.P. Neal, individually and in their official capacities as former Board Members for the South Carolina Department of Juvenile Justice, Defendants.

Civ. A. No. 3:90–3062–17.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 25, 1995.

As Modified on Denial of
Reconsideration Feb. 17, 1995.

W. Gaston Fairey, Rochelle Lyn Romosca, Fairey, Parise & Mills, P.A., Robert O. Meriwether, Alice V. Harris, William S. Brown, M. Clifton Scott, Nelson, Mullins, Riley & Scarborough, Nancy C. McCormick, Holly C. Walker, South Carolina Protection and Advocacy System for the Handicapped, Inc., Columbia, SC, for plaintiffs.

Edward M. Woodward, Frances G. Smith, Woodward, Levintis, Unger, Daves, Herndon & Cothran, Vinton D. Lide, Lide, Montgomery & Potts, Larry L. Vanderbilt, S.C. Dept.

of Juvenile Justice, Columbia, SC, for defendants.

Richard A. Harpootlian, A. Randolph Hough, Sol. Office, Fifth Judicial Circuit, Columbia, SC, amicus curiae.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This is an action initiated by juveniles incarcerated at the four correctional institutions maintained and operated by the South Carolina Department of Juvenile Justice (DJJ). The Plaintiffs initiated this action on December 28, 1990 seeking declaratory and injunctive relief, as well as damages, from the Defendants, the DJJ commissioner and board members. The Plaintiffs challenge numerous conditions of confinement of juveniles housed in the facilities operated by DJJ. They allege that the Defendants, all acting under color of state law, have deprived them of rights secured by the United States Constitution and various federal statutes.

In their answer, the Defendants admit that DJJ is forced to house more juveniles than the facilities were designed to hold, but deny that the overcrowding rises to the level of a constitutional violation. During the trial of this case, however, counsel for the Defendants admitted that current levels of population exceed minimum constitutional standards and consented to an order requiring a release of juveniles to alleviate overcrowding. In regard to the other allegations of the complaint, the Defendants either deny them or admit them with the qualification that

good-faith efforts have been made to secure the necessary funding to improve these conditions. The Defendants further deny that any of the additional violations constitute deprivations of rights secured by the Constitution or various statutory provisions.

### Procedural History of the Case

On January 16, 1991, the court appointed a guardian ad litem [1] to represent the purported class. On March 7, 1991, the court certified the class as consisting of all persons presently and in the future housed within the DJJ correctional facilities. On that same date, the court approved the litigation team assembled to represent the Plaintiffs in this action. The court also allowed Richard A. Harpootlian, Solicitor for the Fifth Judicial Circuit of South Carolina, to participate in this action as amicus curiae.[2]

Acting upon the request of both parties, the court entered an order on September 23, 1991 severing the question of overcrowding for a separate trial and indicating that the court would make a "preliminary determination" as to a suitable population ceiling for all DJJ facilities in dispute. That order provided that the parties would thereafter be directed to negotiate the remaining issues in the case "in light of the court's opinion [on population] which, if unchanged, would likely be embodied in any final relief this court might fashion in this case." The court heard testimony on the population question on December 4 and 5, 1991. The court then determined, in an order dated March 31, 1992, that its decision to sever and try separately the population question was in error.[3] The

---

1. The court initially appointed Inez Moore Tenenbaum as guardian ad litem for the class. After working on the case for several years, Ms. Tenenbaum felt obligated to resign so as to avoid the appearance of a conflict of interest when she entered the race for Lieutenant Governor of South Carolina. The court then appointed Lesly A. Bowers as guardian ad litem to replace Ms. Tenenbaum. Both guardians faithfully represented the interests of their wards in this case.

2. Solicitor Harpootlian provided helpful information to the court during the course of this litigation. The court expresses its appreciation to Mr. Harpootlian for his interest in the complex issues presented here and his involvement in the case.

3. Although the court's March 31, 1992 order determined that it was inappropriate to decide the issues presented in this case in a piecemeal fashion, the court did determine that immediate relief was appropriate for a subclass of incarcerated juveniles: those who are seriously mentally ill or seriously mentally retarded. As to the members of this subclass, the court ordered the Defendants to immediately survey the juvenile population at DJJ facilities to identify seriously mentally ill and seriously mentally retarded juveniles and to begin appropriate treatment for those juveniles. The Defendants have complied with this portion of the March 31, 1992 order, and the Plaintiffs do not seek any additional relief for the members of the subclass at this time.

court reached this conclusion for two reasons: (1) the court decided that the question of overcrowding could not be considered independently of the other issues relating to conditions of confinement that are presented in this case; and (2) both parties and their expert witnesses based their population ceiling analysis on standards promulgated by the American Correctional Association (ACA). The ACA standards have been rejected as inappropriate models upon which to make constitutional population determinations.[4] For those two reasons, the court declined to establish firm, or even tentative, population ceilings.

After the March 31, 1992 order was entered, the parties requested that the court stay its scheduling order to allow the parties an opportunity to discuss an amicable settlement of the case.[5] These efforts proved to be unsuccessful, and the case was therefore restored to the active docket and scheduled for trial in June 1994.

In the course of preparing for the trial of this case, the court has conducted twenty-two hearings and status conferences and issued fifty-four pretrial orders. In addition, the court has visited all of the DJJ facilities on three separate occasions, totaling more than twenty hours of visits. On two of the visits, the court partook of a meal in the DJJ dining facilities. In an effort to acquaint itself with comparable facilities in other jurisdictions, the court visited the Lorenzo Bean Youth Correctional Center near Atlanta, Georgia operated by the Georgia Department of Children and Youth Services. Also, the court visited the Columbia, South Carolina facility of the Alston Wilkes Society.

In 1992, the court appointed five expert witnesses pursuant to Fed.R.Evid. 706: a juvenile correctional expert, an educator, a medical doctor, a clinical psychologist, and an architect. In addition, the court received a copy of the final report of the South Carolina Juvenile Justice Task Force, a blue-ribbon commission composed primarily of prosecutors, police officers, and family court judges, and headed by South Carolina Associate Supreme Court Justice Jean Toal. The Task Force Report identifies many of the problems the State of South Carolina faces with juvenile crime and contains recommendations for improving the state's juvenile justice system.[6]

The non-jury trial of this case began on June 13, 1994 and ended on August 29, 1994. During the course of the trial, the court heard from sixty-six witnesses (including seventeen expert witnesses) and reviewed one hundred and twenty-six exhibits consisting of several thousand pages.

As will be seen from the Findings of Fact and Conclusions of Law which follow, the court has determined that the Plaintiffs have proved that certain conditions of confinement at DJJ facilities violate their constitutional and statutory rights.[7] Rather than imposing

---

4. See pages 798–799 infra.

5. Few cases involving challenges to the conditions of juvenile correctional facilities have been litigated and, of those that have, most have been settled short of trial. See, e.g., Bobby M. v. Martinez, No. TCA 83–7003 (N.D.Fla. July 2, 1987) (final order approving consent decree); Santiago v. Philadelphia, No. 74–2589 (E.D.Pa. Jan. 21, 1988) (third amended stipulation in partial settlement); Jerry M. v. District of Columbia, No. 1519–85(IFP) (D.C.Super.Ct. July 24, 1986) (consent decree); In re Interest of G.C. v. Coler, No. 87–6220–Civ–Gonzalez (S.D.Fla. undated) (settlement agreement); Anthony C. v. Pima County, No. Civ–82–0811W (D.Utah Mar. 27, 1984) (consent decree); Jackson v. Fort Stanton Hosp. & Training Sch., 757 F.Supp. 1231 (D.N.M.1990) (memorandum opinion and order).

6. See S.C. Juvenile Justice Task Force, Juvenile Justice In South Carolina—A Decade for Progress (April 1994) [hereinafter S.C. Juvenile Justice Task Force Report].

7. The Plaintiffs initially sought to recover damages on behalf of all members of the class. At the conclusion of the Plaintiffs' case in chief, the court raised, sua sponte, the question of whether the Plaintiff class should be decertified as to the damages claim. After discussing the matter thoroughly with counsel, the court entered an order on July 5, 1994 concluding that to allow the damages claim to go forward in the class action would "introduce significant individual liability or defense issues which would require separate hearings for each class member." After observing that Fed.R.Civ.P. 23(c)(1) provides that an order certifying a class "may be altered or amended before the decision on the merits," the court decided to decertify the class in regard to the damages claim. Appropriate notice of the court's decertification order was furnished to all class members. The court expresses no opinion

a court-ordered remedial scheme, however, the court has determined that the appropriate course of action is to identify the nature and extent of the violations and then to allow the Defendants a reasonable period of time within which to submit a remedial plan to the court for its review.[8]

### Introduction

 Before delving into the myriad factual and legal issues presented in this case, the court is compelled to make a few general observations. This case lies at the intersection of two of society's most pressing concerns: children and the increasing crime rate. The court must be mindful, as an initial proposition, that its role in this litigation is not to attempt to construct a paragon or "model" training school program for DJJ. The court's role as to the constitutional claims is limited to establishing minimally acceptable constitutional standards. Although the court announced its views in this regard at the outset of the trial, most of the seventeen expert witnesses who testified at trial nevertheless urged upon the court a version of a remedial plan far beyond what the court has determined to be constitutionally required.[9] The court is constrained to conclude that many of these proposals are

model programs which the state of South Carolina, through its duly elected representatives, might voluntarily choose to establish, but not programs that are required as a matter of constitutional law.[10] Thus, the court will grant to the Plaintiffs some, but not nearly all, of the relief they seek in this case.

 Secondly, despite the court's admonition in its March 31, 1992 order and at several later stages of this litigation, both parties continue to argue that the court should adopt the ACA standards as the constitutional minima. The court must reject the parties' invitation to adopt these standards. Although ACA standards might represent desirable goals, it is well established that they do not represent the standards minimally acceptable under the Constitution.

As noted above, the Defendants have, from the outset of this litigation, admitted that their facilities are overcrowded. The Plaintiffs and the Defendants, both focusing upon the ACA standards the court has rejected, have determined between themselves that the rated capacity for the three long-term institutions operated by DJJ is 299 juveniles. Testimony at trial indicated to the court that

---

on the merits of any damages claims that might be brought on an individual basis. *But see Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) ("In an action for damages against a professional [operating a state facility for mentally retarded individuals], the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability.").

8. After the testimony in this case concluded, the United States Congress passed, and the President signed, the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (effective Sept. 13, 1994). Among other things, this legislation limits the jurisdiction of federal courts to entertain Eighth Amendment claims brought by prison inmates challenging the conditions of their confinement. *Id.* § 20409, 108 Stat. at 1827–28 (to be codified at 18 U.S.C. § 3626). This court, acting *sua sponte*, raised with the parties the question of whether this legislation has any application to this case. Both parties conceded that the Violent Crime Control and Law Enforcement Act of 1994 does not bar the court from hearing this case, because the statute limits the court's jurisdiction only

with regard to claims arising under the Eighth Amendment to the United States Constitution. Here, the facilities at issue are training schools for juveniles who have not been convicted of a crime, but rather have been adjudicated to be juvenile delinquents. Although the complaint asserts claims under both the Eighth and Fourteenth Amendments, the court has determined that the Due Process Clause of the Fourteenth Amendments applies to the claims asserted here. Because the Fourteenth Amendment provides more protection to the Plaintiffs than does the Eighth Amendment, it is not necessary for the court to reach the Eighth Amendment claims asserted in this case.

9. For example, the court heard testimony suggesting that DJJ implement extracurricular activities such as a high school newspaper or athletic teams to compete in inter-scholastic competition. Such programs are not required by the Constitution.

10. *See O'Connor v. Donaldson*, 422 U.S. 563, 586, 95 S.Ct. 2486, 2499, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring) ("In [deciding issues relating to involuntary commitment], judges are not free to read their private notions of public policy or public health into the Constitution.").

these institutions routinely hold more than twice that number of juveniles. Thus, most of the testimony at the December 1991 trial and the June 1994 trial centered upon the goal of reducing the juvenile correctional population to a figure approaching the ACA-rated capacity of 299 juveniles.[11] The only real areas of dispute in regard to a population ceiling involved the period of time that the court would allow the Defendants to reduce population to this figure, and the appropriate percentage for a "surge factor" by which the Defendants would be allowed to exceed the applicable population ceiling in emergency situations.

As will be seen below, the court has determined that it will not order a release of any juveniles from DJJ facilities, but will instead require the Defendants to develop and implement a program for appropriately training and housing juveniles who are committed to DJJ facilities by the family court judges of South Carolina. The court's decision not to order a release of juveniles stems from two basic observations: (1) the last dormitories at DJJ facilities were constructed in the 1970s; and (2) since the last dormitories were constructed, the population of South Carolina has increased by nearly forty percent, and violent juvenile crime has skyrocketed, increasing one hundred and forty-nine percent in South Carolina between 1988 and 1992 alone.[12] The court is reluctant to impose on DJJ facilities a population ceiling that is based on an antiquated capacity level which takes no account of the significant increases in population and juvenile delinquency over the past twenty-five years. Instead of ordering the Defendants to release juveniles who have been committed to DJJ facilities by

family court judges and kept there by the Juvenile Parole Board, the court will afford the Defendants the opportunity to develop a plan to adequately house and treat these juveniles. This remedial plan may include, at the Defendants' option, additional dormitories at DJJ facilities in Columbia or, alternatively, several regional community-based correctional facilities.

The court's final observation involves programs to rehabilitate juveniles who are committed to DJJ facilities. As articulated in the South Carolina Children's Code, the policy of the state with respect to juvenile delinquents is to attempt to rehabilitate juveniles who have been deprived of their liberty through the commitment process of the family courts of South Carolina. The court has determined that in many cases the rehabilitative efforts of DJJ are not working and that juveniles are often returned to society more prone to commit crimes than they were before their incarceration.[13] Compared to the other states in the nation, South Carolina is seventh from the bottom in the amount of money it spends on juvenile corrections and fifth from the top in the rate of adult violent crime. The court has determined that there likely is a correlation between these two figures and that, in some cases, South Carolina juvenile correctional facilities produce graduates who later swell the populations of adult correctional facilities and figure prominently in the ranks of those who later commit violent offenses as adults. Although exact figures are difficult to obtain, the evidence indicates that between fifty-six and eighty-two percent of DJJ juveniles later commit crimes as adults and are sentenced to adult prisons.[14] The court hastens to add that

11. At the December 1991 hearing, both parties stipulated that the rated capacity was 299 juveniles. By the time of the June 1994 trial, the Defendants had modified their position somewhat, suggesting that the court should order a reduction to no more than 450 to 520 juveniles at the three long-term institutions.

12. South Carolina Law Enforcement Division, Uniform Crime Reports Division, *Crime in South Carolina 1993*.

13. For example, at trial one of the expert witnesses testified about a study in which juveniles at DJJ were administered the Minnesota Multi-

phasic Personality Inventory (MMPI), a widely used clinical method of testing hostility. The study, which compared the results from MMPI tests given to juveniles shortly after being admitted to DJJ with results from tests given to juveniles shortly before their release from DJJ, demonstrated that juveniles have more hostility and more aggressive tendencies after their confinement at DJJ.

14. The budget for the South Carolina Department of Corrections (SCDC), the state agency charged with operating the adult prison facilities in South Carolina, is easily the fastest growing component of the entire state budget. In the

unsuccessful efforts at rehabilitation stem primarily, if not exclusively, from the lack of adequate funding to devise and implement programs that will allow juveniles to correct their behavior while they are at DJJ facilities.[15]

## Historical Development of Juvenile Justice

Young offenders have historically presented special problems for the criminal justice system. The idea that juveniles who violate the law should be treated differently from adult offenders originated at the end of the nineteenth century, when Chicago established a separate juvenile court and began to employ the common-law doctrine of *parens patriae* to protect children from themselves and their parents.[16] Within twenty-five years of the passage of the Illinois Juvenile Court Act of 1899, all but two states had established specialized courts for children.[17]

■ A second revolution in juvenile justice began in 1967, when the United States Supreme Court held that, in juvenile commitment proceedings, juvenile courts must afford to juveniles basic constitutional protections, such as advance notice of the charges, the right to counsel, the right to confront and cross-examine adverse witnesses, and the right to remain silent. *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Juveniles are not, however, accorded the full panoply of rights that adult criminal defendants are accorded, such as the right to trial by jury. *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). As a result, juvenile courts still process juvenile delinquents in a manner more paternal and diagnostic than that afforded their adult criminal counterparts.

■ In South Carolina, incarceration of juveniles is said to be for beneficent rather than punitive purposes. *See* S.C.Code Ann. § 20–7–20 (Law. Co-op.1985 & Supp.1993). Exclusive jurisdiction over juveniles who are alleged to be delinquent is vested in the South Carolina Family Court. S.C.Code Ann. § 20–7–400(A)(1)(d), (3) and (4) (Law. Co-op.1985 & Supp.1993). When a family court judge makes a determination of delinquency, the judge has a variety of options: place the child on probation (which may include restitution or community service as a condition of probation); impose a fine of up to $200; order that the child be examined or treated by a physician, psychiatrist, or psychologist; order other care and treatment as the court "considers best"; or commit the child to the custody of a public or private institution. S.C.Code Ann. § 20–7–1330 (Law.Co-op.Supp.1993).

When a family court judge determines that incarceration may be appropriate, the judge must commit the juvenile to the DJJ Reception and Evaluation Center for a period not to exceed forty-five days. At the Reception and Evaluation Center, DJJ social workers perform an evaluation and make a recommendation to the committing court. The juvenile is then once again taken before the committing judge, who has the option of releasing the juvenile to his or her family or committing the juvenile to one of the three long-term institutions operated by DJJ. By law, the commitment must be for an indeterminate sentence not to extend beyond the juvenile's twenty-first birthday. S.C.Code Ann. § 20–7–2170 (Law.Co-op.Supp.1993). The actual length of stay for the juvenile is determined by the Board of Juvenile Parole, which authorizes release of juveniles based upon internal guidelines developed by the

sixteen-year period between 1977–78 and 1993–94, SCDC's operating budget increased by 800%—from $29.9 million to $224.7 million. During the same period of time, the adult inmate population increased from 6,667 to 17,182. In addition, during the past decade, South Carolina spent $202 million to build seven new adult prisons.

**15.** The court noted in 1992, after its first visit to the DJJ facilities, that the institutions were "staffed and led by well-meaning, caring individuals, whose good faith efforts [are] severely strained by the sheer numbers of juveniles present." After receiving the evidence in this case and visiting the DJJ facilities on two additional occasions, the court reaffirms its earlier finding that the personnel employed by DJJ are doing the best they can under difficult circumstances.

**16.** James O. Finckenauer, *Juvenile Delinquency and Corrections—The Gap Between Theory and Practice* 116 (1984).

**17.** *Id.*

Board. S.C.Code Ann. §§ 20–7–2095 and 20–7–2125 (Law.Co-op.Supp.1993). DJJ thus controls neither its front door nor its back door: Admission to the institutions is controlled by the family courts; release is controlled by the Juvenile Parole Board. The average length of stay for juveniles committed to the long-term institutions is seven months.

The DJJ facilities at issue in this litigation are all located behind an escape-resistant fence on a two hundred-acre campus on Broad River Road in Columbia, South Carolina. The oldest facilities date from the late nineteenth century.[18] Historically, the conditions of the juvenile facilities in South Carolina were deficient. In the late 1960s, Howard James, a Pulitzer-prize winning reporter for the *Christian Science Monitor*, investigated juvenile correctional systems across the country and described South Carolina's as among the worst in the nation.[19] In response to James's findings, a special committee of the South Carolina General Assembly conducted a hearing to consider improvements. The testimony of James and others spurred the state legislature to enact reforms and to construct additional youth facilities. Conditions improved so dramatically that, in 1977, in a federal lawsuit over Mississippi's juvenile correctional facilities, the Commissioner of the South Carolina Department of Youth Services[20] was called as an expert witness to testify about South Carolina's then state-of-the-art Birchwood facility. *See Morgan v. Sproat*, 432 F.Supp. 1130 (S.D.Miss.

1977) (citing expert testimony of Grady A. DeCell, then Commissioner of the South Carolina Department of Youth Services). Since the mid to late 1970s, however, facilities and programs have once again deteriorated, prompting the filing of this litigation in December 1990.

By any measure, juvenile crime has increased dramatically in recent decades. One study by the United States Department of Justice indicates that, nationwide, juvenile arrests for violent crime increased forty-one percent between 1982 and 1991.[21] In 1990, the total estimated delinquency caseload for the United States was 1.26 million cases.[22] The figures in South Carolina are even more staggering. Recent statistics in South Carolina show that the growth rate of juvenile crime has significantly outpaced population growth.

All of the experts who testified at trial suggested that the recent increase in juvenile crime is likely to continue, if for no other reason than demographics. By the year 2005, there will be twenty-three percent more teenagers nationwide than there are today.[23]

In an effort to identify the causes of the spiralling juvenile crime rate, the court carefully inquired of each of the expert witnesses as to their opinion of the reasons that underlie the increase. The reasons most commonly given may be summarized as follows: a significant increase in the number of single-parent families,[24] involvement with alcohol

18. According to DJJ's annual report, the first facility in South Carolina was a reformatory for boys, which was constructed in 1875.

19. In a series of articles entitled "Children in Trouble: A National Scandal," which appeared weekly in the *Christian Science Monitor* from March 31, 1969 to July 7, 1969, James described the poor conditions he found in the South Carolina juvenile justice system, as well as in other juvenile programs across the nation, during this time period.

20. As part of a state government restructuring program in 1993, the name of the agency was changed from the South Carolina Department of Youth Services to the South Carolina Department of Juvenile Justice.

21. Office of Justice Programs, U.S. Department of Justice, *Comprehensive Strategy for Serious, Violent and Chronic Juvenile Offenders* 2 (1994).

22. National Council on Crime and Delinquency, *Criminal Justice Newsletter*, Feb. 15, 1994, at 6.

23. One writer has noted that "although juveniles represent less than fourteen percent of the population in this country, they account for nearly twenty-five percent of individuals arrested for violent crimes such as homicide, rape, robbery and felonious assault." Brian R. Suffredini, Note, *Juvenile Gunslingers: A Place for Punitive Philosophy in Rehabilitative Juvenile Justice*, 35 B.C.L.Rev. 885, 899 (1994).

24. As one writer has observed:
There is a mountain of scientific evidence showing that when families disintegrate, chil-

and other drugs, involvement in gangs and other anti-social groups, exposure to violence in entertainment and in the mass media, and access to firearms. Most juveniles who are at greatest risk of becoming extremely aggressive and violent tend to share some of these common experiences or characteristics that appear to place them on what one organization has termed a "trajectory toward violence."[25]

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52. The court notes that to the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

The South Carolina Department of Juvenile Justice is the state agency charged with housing and rehabilitating wayward youth in South Carolina between the ages of twelve and seventeen. DJJ case workers around South Carolina processed 24,767 juveniles in fiscal year 1993–94. Most of these juveniles were either diverted from the juvenile justice system or placed on probation by a family court judge. In 1993–94, just eight percent (2,093) of the juveniles who were screened were actually sent to the Reception and Evaluation Center to be considered for confinement at the long-term institutions. Of these, approximately one-half (994) were actually placed at one of the institutions during

the last fiscal year. The vast majority of the juveniles who are recommended for long-term placement are those who have committed offenses that society would generally describe as violent or serious.[26]

A recent study commissioned by DJJ contains ominous predictions for the future. If present trends in violent juvenile crime continue, by the year 1997 DJJ will need 1,310 beds, and by the year 2002, the department will need a total of 1,899 beds.[27] At the time of trial, population at the long-term institutions ranged from 670 to 730 juveniles.

This case involves the juveniles who are temporarily housed at the Reception and Evaluation Center, as well as those who are confined at the three long-term institutions. These juveniles claim that the basic ambient conditions of confinement—food, shelter, sanitation, living space, health care, recreation, programs, classification, discipline, and personal safety—are so inadequate that exposure to them constitutes a deprivation of their rights secured by the Fourteenth Amendment to the United States Constitution.

As to the internal operation of the institutions, after studying the extensive record in this case, the court has determined that some basic reforms are necessary. The Defendants have already taken steps to implement almost all of these reforms, primarily in response to this lawsuit. These improvements, however, fall far short of the sweeping and intrusive relief the Plaintiffs seek in this case. For the court to grant the full relief sought by the Plaintiffs in this case would be to involve the court in micro-management of

dren often end up with intellectual, physical and emotional scars that persist for life.... We talk about the drug crisis, the education crisis, and the problem of teen pregnancy and juvenile crime. But all these ills trace back predominantly to one source: broken families. Karl Zinsmeister, "Raising Hiroko," *The American Enterprise*, March/April 1990. Table 3 appended to this order is a graph depicting the increase in the percentage of births to single mothers in South Carolina since 1950. Table 4 is a similar graph showing the percentages, nationwide, during a similar period. The increases on these charts roughly parallel the increase in juvenile crime during the same time period. According to DJJ records, only twelve percent of

juveniles in South Carolina who are incarcerated come from a household in which both natural parents live at home.

25. American Psychological Association, *Violence and Youth: Psychology's Response* 21 (1993).

26. Table 1 attached to this order contains a listing of the offenses for which each juvenile was committed to DJJ as of May 4, 1994.

27. Rosser Fabrap, *South Carolina Department of Juvenile Justice Needs Assessment and Master Plan* 1–5 (Feb. 1993).

the juvenile institutions in a manner neither required nor sanctioned by the Constitution.

As to overcrowding generally, the court has determined that an outright release of juveniles from the institutions—when there are no pre-release centers, halfway houses, or similar facilities available to reintegrate the juveniles into society—is not in the best interest of the juveniles themselves or the public. Alleviation of overcrowded conditions may not be solved by a simplistic meat-ax approach; rather, the Defendants must be ordered to develop new facilities and programs in order to fulfill DJJ's statutory mission.

I

### The Reception and Evaluation Center

The Reception and Evaluation Center is the institution designated to receive and evaluate juveniles considered for long-term confinement by the family court. Approximately 2,000 juveniles pass through the institution each year. By law, a juvenile's stay at the Reception and Evaluation Center may not exceed forty-five days. At the time of trial, the average stay was twenty-one days.

The Reception and Evaluation Center, the oldest of the DJJ institutions, is located separately from the other institutions on Broad River Road. The living units, cafeteria, and school building all appear to have been constructed before the 1950s. The activity building clearly pre-dates World War I. The infirmary and intake operations are housed in what appears to be an old mobile home or portable classroom. Juveniles at this institution are evaluated during their stay, after which they are returned to their home county for disposition by the family court. Disposition is the functional equivalent of sentencing in an adult case. The Reception and Evaluation Center frequently experiences severe overcrowding.

The Defendants have announced their intention to close the Reception and Evaluation Center by January 1996. Its functions will be allocated to three regional Reception and

Evaluation Centers for which state bond money has already been committed. The state has already acquired the proposed sites, and construction is anticipated to begin shortly.

Although the testimony indicated that some of the facilities at the current Reception and Evaluation Center are substandard, the court declines to grant affirmative relief as to this aging institution that will be soon replaced. It would represent an unwise use of scarce resources for the Defendants to attempt to improve the structures at the Reception and Evaluation Center when the Defendants have pressing needs at their other institutions. Moreover, the court finds that the constitutional rights of juveniles who are confined to the Reception and Evaluation Center between the date of this order and the date of the closing of the institution will not be violated in light of the fact that the average stay at Reception and Evaluation is twenty-one days, and the maximum stay, by law, may not exceed forty-five days. *Cf. Bell v. Wolfish,* 441 U.S. 520, 543, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1979) ("We simply do not believe that requiring a detainee to share toilet facilities and [an] admittedly rather small sleeping space with another person for generally a maximum period of sixty days violates the Constitution.").

II

### The Long–Term Institutions

The three long-term institutions, or training schools,[28] are Willow Lane, John G. Richards, and Birchwood. The long-term institutions generally house between 670 and 720 juveniles. The average length of stay is seven months. Following is a brief description of the physical plant and functions of the three campuses.

Willow Lane houses all of the female juveniles, as well as the less aggressive and younger males. The Willow Lane campus consists of some twenty structures generally constructed in 1966 and 1972. The campus contains five dormitories, a cafeteria, and

---

**28.** Throughout this opinion, the terms "juvenile correctional facility" and "training school" are used interchangeably.

educational, medical, and administrative facilities. The infirmary (constructed in 1972) and the dental facility (constructed in 1977) serve all three long-term campuses.

John G. Richards houses older male juveniles and contains many of the special program dorms. The John G. Richards campus, which was generally constructed in the early 1970s, consists of five dormitories, a cafeteria, and administrative and recreational facilities. The campus also contains the "Intake/SPU" unit, which serves as a maximum security facility for the John G. Richards and Willow Lane campuses. The cafeteria facility, constructed in 1970, provides food preparation and dining services for the John G. Richards and Birchwood campuses, as well as for the Reception and Evaluation Center.

Birchwood houses the oldest, most aggressive male residents. The Birchwood campus is the newest of the four campuses. Generally constructed in the mid–1970s, the campus contains four dormitories, administrative offices, and vocational and academic educational facilities. It also has an artificially surfaced playing field, a gymnasium, an auditorium, covered picnic shelters, and a baseball diamond. Also located on the Birchwood campus is the Santee unit, a maximum security facility.

All of the dormitories on the three campuses of DJJ have air conditioning, heating, hot and cold water, fire detection and sprinkler systems, and water fountains. Most residence halls are arranged with several wings of rooms in a dormitory-style configuration, with a central lavatory/shower facility and one or more common areas for daily activities. In many cases, the common areas are utilized for additional bed space. In general, the architecture of the school facilities at the three campuses appears to be comparable to other educational facilities constructed during the same time frame.

Although the Plaintiffs' claims originally included all four institutions at DJJ, as noted earlier, the court has determined that no affirmative relief is necessary with regard to the Reception and Evaluation Center. The remainder of this order, therefore, will address the totality of the conditions of confinement at the three long-term institutions.

Except for the deficiencies noted below, the court finds no other constitutional or statutory violations of the Plaintiffs' rights.

## A. Discipline

An effective discipline system is necessary in a juvenile correctional institution to aid staff in controlling violence and other inappropriate behavior, to maintain safety and security, and to serve as a training tool for the overall purpose of correcting the juveniles' behavior. The Plaintiffs mount a variety of attacks against the system of discipline in place at DJJ facilities, which depends primarily upon the use of lock-up units and CS gas to punish juveniles for disciplinary infractions. The Plaintiffs challenge the procedures by which juveniles are placed in lock-up units and the Spartan conditions of the lock-up cells themselves. They also seek to have the court impose a one-hour limitation on the duration of their stay in lock-up facilities. They seek an order of this court imposing "less intrusive and more effective methods of maintaining security and control." The Plaintiffs also seek to have the court prohibit the use of CS gas altogether.

With the exception of the use of CS gas, discussed more fully below, the court has determined that the United States Constitution does not require this court's intervention in the disciplinary procedures at DJJ.

### Use of CS Gas

CS gas is a potent form of tear gas used primarily for riot control. It draws its name from Ben Courson and Roger Staughton, the American chemists who developed it. The evidence at trial disclosed that, until recently, DJJ agency policy permitted the use of CS gas to "maintain control," as well as to prevent harm or the threat of harm to individuals. CS gas irritates the mucous membranes of those who are exposed to it. Exposure to the gas causes instant pain and spasms in the eyelids, coughing fits, and breathing problems. Documented studies indicate that CS gas can cause damage to the cornea and potential blindness; damage to the skin, such as chemical burns, blistering, and scarring; and severe complications for asthmatics, including respiratory damage and chronic lung disease.

CS gas has been used on a fairly regular basis in the DJJ institutions. The Defendants' own records indicate that gas was used on juveniles more than 180 times in the 1993 calendar year. To its credit, DJJ requires that strict records be maintained any time gas is used on a juvenile. After reviewing the Defendants' use of force/gas reports, however, the court finds that gas has been used for purposes other than the protection of staff or others. Indeed, the Defendants' own records indicate that gas was used "to enforce an order" in more than fifty incidents in 1993.

■ The court finds that the use of CS gas upon juveniles is counterproductive. It causes more anger in the juveniles toward the adults who are supposed to be caring for them. The use of gas as a form of punishment teaches the victims to inflict pain as a method of controlling others and makes the juveniles more volatile, more aggressive, and less likely to respond properly to authority figures. Moreover, the inappropriate use of CS gas may cause long-term medical complications for the juveniles. For these reasons, the court concludes that the indiscriminate use of CS gas violates the juveniles' constitutional rights under the Due Process Clause. Based upon the testimony presented on this issue, the court finds that gas should be used only when a genuine risk of serious bodily harm to another exists and other less intrusive methods of restraint are not reasonably available.

At trial, DJJ Director Flora Brooks Boyd testified that she intended to implement a new policy regarding the use of CS gas consistent with the requirements stated above. She also testified that she plans to maintain a reliable system to monitor gas use and will personally review every incident in which gas is used. The Defendants should therefore include a detailed plan for the use of CS gas, consistent with the requirements of this section, as part of the overall plan submitted in response to this court's order.

■ Except for the use of CS gas, the court finds no other constitutional deficiencies in the discipline system at DJJ facilities. For this court to intervene in the routine administration of disciplinary programs at DJJ would be to substitute the court's judgment for that of trained penological authorities charged with the administration of DJJ facilities.

## B. Fire Safety

The Plaintiffs presented testimony on one issue related to fire safety: whether securing the individual cells of the two lock-up units, known as Santee and the SPU unit, with padlocks creates an unreasonable risk of harm to the juveniles who are confined in these units.

■ At DJJ, the greatest risk of harm from fires is from mattress fires. Mattress fires emit insufficient heat to set off the sprinkler system, but cause substantial amounts of smoke which can be fatal to the occupants of the units if those juveniles are not removed quickly. In each of the two disciplinary units at DJJ, the thirty individual cells are all secured with individual padlocks. In the event of a fire, each cell must be opened by hand, a time-consuming process which constitutes an unreasonable risk of harm to the Plaintiffs housed in these two units. The court thus concludes that the use of individual padlocks on the cells in the Santee and SPU lock-up units unreasonably infringes upon the Plaintiffs' safety interest. While locking devices are undoubtedly necessary for security and control, there are alternative locking methods available which do not have the same degree of inherent risk to safety. During the trial, the Defendants agreed to install a "gang" locking system for these units, which would allow supervisory personnel to simultaneously unlock all doors in the event of a fire. The court finds that such a system would be adequate to protect the safety interests of the Plaintiffs. The Defendants should include a reasonable timetable for the incorporation of a gang locking system into the two lock-up units as a part of the remedial plan submitted in response to this order.

## C. Food Service

Juveniles at the John G. Richards and Willow Lane institutions dine in the dining facilities on those campuses. Neither Birch-

wood nor the Reception and Evaluation Center has its own cafeteria facility. Food is prepared at John G. Richards and shipped to Birchwood for two meals, and the juveniles at Birchwood are transported to John G. Richards for the third meal each day. Similarly, food is transported from John G. Richards to the Reception and Evaluation Center for service to the juveniles at that institution.

■ At trial, several juveniles, and even the food services director, testified that frequently cockroaches and other foreign matter are present in the food served to the juveniles. The court finds that the Defendants have an obligation to provide minimally adequate nourishment to juveniles housed at their institutions, and that food containing cockroaches and other foreign matter falls below what may be deemed minimally adequate.

The Defendants have conceded that they must eliminate these problems and have begun measures to correct them. At trial, the food services director testified that the department has entered into a new contract with an exterminator, has installed new doors and weatherstripping in response to a consultant's suggestion, and has implemented improved procedures for washing utensils and trays. As a part of the remedial plan submitted in this case, the Defendants should furnish a progress report on these and any other improvements that will assure the removal of cockroaches and other foreign matter from food served to juveniles at DJJ.

### D. Classification .

■ Classification, for the purposes of this case, is the process of separating aggressive juveniles from passive ones and determining appropriate levels of restraint for each juvenile based upon the threat the juvenile presents to other juveniles and to the public. The juveniles possess a clearly recognized liberty interest in being free from unreasonable threats to their physical safety. *See Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982). On the other hand, the general public is entitled to reasonable protection from juveniles incarcerated at DJJ.

■ For these reasons, juveniles in DJJ facilities should be screened and classified, so that the aggressive juveniles are identified and separated from more passive juveniles. The level of restraint to be used for each juvenile should be based upon some rational professional judgment as to legitimate safety and security needs. Inherent in this right is a system of periodic review of the initial placement to evaluate whether subsequent events demonstrate the need for a reclassification of the juvenile's security requirements.

Until recently, a rational and minimally adequate system of classification did not exist at DJJ. Safety to juveniles and to the public was occasionally threatened by this deficiency.

In response to this litigation, the Defendants have recognized their obligation to establish a minimally adequate classification system and, by the time of the court's last visit on October 11, 1994, had begun to fulfill that obligation by placing into operation a special department, known as the Admissions Unit, to appropriately classify and place juveniles in the long-term institutions. The court finds that the Admissions Unit should satisfy the requirements of the Constitution in terms of classification. The full details of the classification system that has been established should be included in the overall remedial plan submitted to the court for its review.

### E. Education

. The campus of the South Carolina Department of Juvenile Justice is an independent school district subject to all state and federal laws regarding public education. All juveniles in the four institutions attend school from 8:30 a.m. until 3:30 p.m., five days a week. Unlike their counterparts in the traditional school system, however, juveniles at DJJ are required to attend school year round. Students generally attend the school associated with the campus where they reside, although students who are ahead of or behind most of their peers may be transported to another school on the DJJ campus.

At Birchwood High School, vocational education is available in a number of fields, such as graphic art and communication, automobile mechanics and body work, vocational

rehabilitation work program, carpentry, building construction, and introduction to personal computers.

Generally speaking, classes at the DJJ schools are small, with a sixteen-to-one student/teacher ratio in regular education and an eight-to-one student/teacher ratio in special education.[29] The average DJJ student is three years below his or her expected grade level. The educational program is highly remedial, allowing extensive mainstreaming of juveniles receiving special education.

The court finds that there are a disproportionately high number of juveniles at DJJ school facilities who are suffering from a "disability" as that term is defined in the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* As a recipient of federal funds, DJJ is under a legal obligation to identify and evaluate juveniles who are in need of special education and related services. For juveniles who are thus identified, the educational institution must formulate and implement an "Individualized Education Program" (IEP) for the juvenile.

As of the time of trial, the percentage of juveniles in special education programs at DJJ schools ranged between 17.9% (at Birchwood) and 32.5% (at Willow Lane). The Defendants' own educators admitted that perhaps as many as fifty percent of the juveniles at DJJ are in need of special education. The court finds that the Defendants have not adequately identified juveniles in need of special education and, in some instances, have not fully formulated and implemented IEPs for those juveniles who have been identified.

Much of the difficulty that DJJ has experienced in this regard stems from two problems not of its own making. First, local school districts around South Carolina have traditionally been reluctant to forward a juvenile's school records when he or she is sent to DJJ. And second, the South Carolina Department of Education has interpreted IDEA and Section 504 rigidly, requiring DJJ

to formulate not one but two IEPs for the juvenile: one during the juvenile's brief stay at the Reception and Evaluation Center and another if and when the juvenile is confined to a long-term institution. The court finds that the inability to obtain proper school records and the burdensome requirement of formulating an interim IEP for juveniles at the Reception and Evaluation Center have impaired the Defendants' ability to properly identify and serve juveniles confined to the long-term institutions who are in need of special education services. As will be seen in the Conclusions of Law section of this order, these two impediments to full implementation of IDEA and Section 504 have now been removed. With these obstacles out of the way, the court must expect full compliance with all federal statutes regarding educational needs of students with disabilities.

Aside from the deficiencies noted above, the court finds that no other aspect of the education program at DJJ violates the juveniles' constitutional or statutory rights on a class-wide basis.

### F. Medical Services

■ Among the traditionally recognized liberty interests of the Plaintiff class that survive confinement is the right to minimally adequate health care. *See Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Testimony at trial disclosed that medical resources for the various DJJ institutions are stretched to the limit. The institutions are forced to rely upon only three full-time nurses and a handful of part-time nurses to serve a population totaling almost 900 juveniles. One medical doctor is under contract to visit the facilities once a week for a total of three hours. For this reason, DJJ is forced to rely upon emergency rooms at local hospitals for matters, such as cuts requiring sutures, that could be handled in house much more efficiently and less expensively.

Both the medical experts and the DJJ medical staff testified that the inadequate number of nurses, nurse practitioners, and

---

**29.** Outside of DJJ institutions, the statewide student/teacher ratio is thirty-to-one for high school

and twenty-five-to-one for elementary schools.

physicians prevents DJJ from providing appropriate medical care and places the health of all juveniles in the population at risk. At minimum, DJJ should employ a sufficient number of trained medical staff to provide the basic components of a medical system for the institutions. Central to the issue of medical staffing is the necessity of a supervising physician to assure that the overall system is functioning properly to meet the health needs of the population. Nursing staff should be available to adequately provide daily review of sick call requests, to administer reasonably prompt medical care, and to train other staff members in identifying and monitoring the juveniles' illnesses.

Acting to correct an admittedly deficient system, DJJ has contracted with the South Carolina Department of Health and Environmental Control (DHEC) to run the health care program at the DJJ facilities. At trial, the Defendants were optimistic that the unconstitutional conditions regarding health care would be cured if and when DHEC begins providing services. During the trial of this case, the Defendants were still working out the details of the arrangement with DHEC; therefore, the Defendants must submit the final proposal with DHEC to the court for its review as part of the overall plan submitted in this case.

### G. Grievance/Ombudsman System

■ The court finds no violation of the juveniles' constitutional rights in regard to the operation of the grievance and ombudsman system at DJJ facilities. Were this court to order the reforms to the grievance and ombudsman system suggested by the Plaintiffs' counsel, the court would impermissibly be encroaching upon a policy decision better left to the agency.

### H. Access to Legal Assistance

The Plaintiffs contend that they are constitutionally entitled to reasonable access to the courts during their stay at DJJ and that the court should order the Defendants to provide "an adequate law library or adequate assistance from persons trained in the law." Although the Supreme Court has extended such protections to adult prisoners incarcerated for violations of the law, *see Bounds v.* *Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), the Court has never extended its holding to juvenile delinquents being housed at training schools for a beneficent purpose. Admittedly, one district court has extended the right of access to courts to juvenile facilities; but it did so primarily because the stipulated record in that case disclosed that most of the juveniles had been committed to the institutions without having been represented by legal counsel. *See Morgan v. Sproat,* 432 F.Supp. 1130, 1158 (S.D.Miss.1977). Moreover, the court in *Morgan* merely accepted a proposal by the defendants that juveniles be notified that they might contact a community legal services association if they needed legal service.

■ The situation in South Carolina is quite different. State law provides that any juvenile involved in a delinquency proceeding that may result in commitment to an institution has the right to retain counsel or the right to court-appointed counsel at state expense if he or she cannot afford an attorney. S.C.Code Ann. § 20–7–740 (Law.Co-op.1985). In like manner, state law provides that juveniles appearing before the Juvenile Parole Board have the right to counsel of their choice or court-appointed counsel if they cannot afford such assistance. S.C.Code Ann. § 20–7–2105 (Law.Co-op.1985). Furthermore, state law provides that after an initial waiting period, each juvenile has the right to appear before the Juvenile Parole Board every three months for the purpose of parole consideration. S.C.Code Ann. § 20–7–2095 (Law.Co-op.Supp.1993). In addition, the evidence at trial disclosed that juveniles are permitted periodic contacts with the outside world and thus would have the ability to secure the services of a legal aid society or other appropriate legal representative. Because the state of South Carolina provides ample opportunity for court-appointed legal representation—both at the time of commitment and as frequently as once every three months for parole consideration—and because DJJ does not prohibit the juveniles from periodic contacts with the outside world, the court finds that the Plaintiffs have not been deprived of a right to reasonable access to the courts.

In regard to the request for a law library, the court finds that the Plaintiffs have no constitutional right to a law library. As a practical matter, juveniles between the ages of twelve and nineteen, who, on average, are three years behind their expected grade level, would not benefit in any significant respect from a law library, and the provision of such would be a foolish expenditure of funds.

## I. Programs

It was apparent from the testimony in this case that programming geared toward correcting the behavior of juveniles is central to the very nature of a juvenile training facility. Virtually every witness who testified in the case asserted that appropriate programming can make a difference and substantially enhance the juveniles' opportunity to succeed upon release from confinement. Ms. Marlene McClain, the Chairman of the Juvenile Parole Board, testified that the Board would release juveniles sooner (and thereby reduce overcrowding) if DJJ maintained a minimally adequate level of programming. Additionally, because such programming improves the juveniles' behavior while confined, it reduces the need for disciplinary lock-up and enhances the safety of the institution for the juveniles and the staff. Without minimally adequate programming, the agency is simply warehousing the juveniles and ignoring the statutory purpose of their confinement. As journalist Howard James observed, "Too often all that society provides [for juveniles] *is* storage—like ripe peaches in a warm cellar." [30]

The court finds that, under the Constitution, a minimally adequate level of programming is required in order to provide juveniles with a reasonable opportunity to accomplish the purpose of their confinement, to protect the safety of the juveniles and the staff, and to ensure the safety of the community once the juveniles are ultimately released. Minimally adequate program services should be designed to teach juveniles the basic principles that are essential to correcting their conduct. These generally recognized principles include: (1) taking responsibility for the consequences of their actions; (2) learning appropriate ways of responding to others (coping skills); (3) learning to manage their anger; and (4) developing a positive sense of accomplishment.

It is in the area of programming that conditions at DJJ have improved most during the pendency of this litigation. When this action was initiated, the Defendants offered the juveniles a very limited number of programs: anger management, drug and alcohol therapy, and, if appropriate, sex offender treatment. Since this lawsuit was filed, however, the Defendants have initiated several innovative programs, including the Junior Reserve Officer Training Corps (JROTC) Program, the START Program, the Cities in Schools Program, and the Omega Boys Choir.[31] Juveniles who opt to participate in these programs and who meet the entrance requirements are housed in special dormitories. Preliminary data from all of these programs indicate that the juveniles are much better behaved while in the system, are paroled at their minimum guidelines, and do well after they are released from confinement. The administrators of these programs reported that there is little or no violence in these dorms and that CS gas is not used. None of the twenty-two graduates of the JROTC program has been rearrested, and only about fifteen percent of the START graduates have returned to confinement. Significantly, all of the juveniles in these special programs are housed in dormitories that exceed, to some extent, the ACA-rated capacity for population. Rehabilitative efforts are successful with these groups of juveniles, however, because the programs take the juveniles out of the overcrowded dormitories for substantial periods of time and provide juveniles with reasonable opportunities to correct their behavior.

At trial, the Defendants conceded that they have an obligation to develop effective programming for all of the juveniles housed at DJJ facilities. The programs described

---

**30.** Howard James, *Children in Trouble* 32 (1970).

**31.** The JROTC and Cities in Schools Programs at DJJ are the only such programs at a juvenile correctional facility in the United States.

above have been implemented incrementally and presently serve no more than half of the juveniles housed at DJJ facilities. For the juveniles who are not enrolled in these special programs, the Defendants must develop a reasonable timetable for developing minimally acceptable programs, as defined herein, for juveniles during their stay at DJJ.

### J. Overcrowding and Staff Levels

At present, the number of juveniles housed in the DJJ long-term institutions remains at a fairly constant level between 670 to 720 juveniles. The Defendants have conceded in their pleadings that the facilities at issue in this litigation are overcrowded in a constitutional sense. Thus, the only questions to be resolved by this court are the extent of the overcrowding and the appropriate remedy. The Plaintiffs seek to have the court adopt standards promulgated by the American Correctional Association, which, if applied to the institutions in dispute here, would yield a total rated capacity of only 299 juveniles. The Plaintiffs would have the court order the periodic release of juveniles until the population at DJJ approaches the ACA figure. The Defendants initially conceded that the ACA standards were applicable in this case, but by the time of the June 1994 trial, they had modified their position so as to assert that a population reduction to between 450 to 520 juveniles is appropriate.

As will be seen in the Conclusions of Law section of this opinion, the court must respectfully decline the invitation to adopt the ACA standards as the constitutional minimum. The Supreme Court itself has declared that such standards represent "goals" of the sponsoring organization, but do not establish the benchmark from which constitutional determinations may be made.

For this reason, the court's findings regarding overcrowding are based not upon ACA standards, but upon the court's review of the extensive record in this case and its three visits to the institutions under challenge. Additionally, as the court noted in its March 31, 1992 order, the overcrowding issue may not be considered in a vacuum. The issues of population, program effectiveness, physical plant, staffing, security, and other conditions of confinement have a direct bearing upon one another.

The court finds that a reasonable level of population at DJJ is that level which provides the minimum amount of physical space juveniles need for adequate living conditions and does not unreasonably threaten safety or unreasonably frustrate the purpose of confinement. Applying this standard to the facilities at issue here, the court concludes that the long-term institutions at DJJ currently house more juveniles than the Constitution will allow. All of the witnesses, including administration and staff of DJJ, agreed that at current population levels, DJJ's systems relating to security and safety are overburdened to such an extent that DJJ cannot adequately perform its mission. The witnesses agreed that overpopulation interferes with the underlying purpose of correcting the juveniles' behavior and providing safety for the general public. This testimony is corroborated by the current recidivism rate for DJJ adolescents (as high as eighty-two percent) and the periodic escapes of juveniles from the institutions.

As noted previously, the court visited the facilities in dispute on three occasions. These visits confirmed that many of the dormitories are severely overcrowded. For example, the Moultrie dormitory on the Birchwood campus has twenty individual rooms, but sometimes houses as many as ninety juveniles. At Moultrie, beds are routinely placed in the hallways and in the dayrooms. The beds in the dayrooms are scarcely two feet apart, leaving the juveniles with hardly enough room to maneuver to their beds from the doorway. Occasionally, mattresses must be placed on the floor.

Having determined that the long-term institutions are overcrowded, the court is nevertheless constrained to conclude that an order reducing overpopulation by the simple expedient of releasing juveniles is not in the best interest of the juveniles or the public, nor is it required by the Constitution.

As has been noted, the last dormitories at the long-term institutions began operating in the mid–1970s. In South Carolina, popula-

tion generally,[32] and juvenile crime in particular,[33] have both increased dramatically since that time. It would be an understatement to say that DJJ's building program has not proceeded apace with the significant growth in population and juvenile delinquency in South Carolina; there has, in fact, been *no* building program for the past twenty-five years. Thus, any effort to reduce overcrowding by working down to the design capacity of the present buildings is necessarily flawed because it is premised on the indefensible notion that the number of juveniles who need to be incarcerated in South Carolina in 1995 equals the number of bed spaces that were constructed on the DJJ campus a quarter century ago.

The Plaintiffs argue that the court could order an immediate release of 200 juveniles with no threat to public.safety. The Plaintiffs base this argument upon the notion that a significant number of juveniles incarcerated at the long-term facilities are "lightweight" offenders who have been sent to DJJ for relatively minor infractions. While the argument that relatively non-violent offenders should immediately be released to alleviate overcrowding has obvious superficial appeal, the court has determined that very few juveniles incarcerated at the long-term facilities fall into this category.[34] As previously noted, only about four percent of the approximately 24,000 juveniles who are processed through the family courts of South Carolina each year end up in the long-term institutions. In other words, DJJ intake workers and family

court judges exercise their discretion in favor of diversion and probation in an extremely .high number of cases, reserving long-term institution beds for more-violent juveniles truly in need of secure confinement.

In an effort to obtain a fair assessment of the types of juveniles committed to the long-term institutions, the court requested the Defendants to provide confinement records of all juveniles who were housed at the long-term institutions one month prior to trial. The Defendants furnished these records, and the court has reviewed them in exhaustive detail. These records reveal that, for the most part, the juveniles confined at the long-term institutions have committed serious offenses and require secure confinement. For example, Table 1 attached to this order summarizes the offenses for which juveniles were committed to DJJ as of May 4, 1994. Although over half of these juveniles were committed for a "serious/violent" offense as defined by DJJ, the department's definition is underinclusive—it does not accurately reflect the gravity of the offenses for which the other juveniles are committed. As Table 1 indicates, crimes such as carrying a weapon on school grounds, discharging a firearm into a dwelling, and possession of LSD or cocaine with intent to distribute are not classified by DJJ as serious or violent crimes. Contrary to the assertions of some of the witnesses in this case, a relatively insignificant number of juveniles at DJJ have been committed for minor property offenses or status offenses.[35]

**32.** The population in South Carolina has increased by forty percent since the last dormitory rooms were constructed at DJJ. *See* U.S. Bureau of Census, U.S. Department of Commerce, *1970 Census of Population* (1971) and U.S. Bureau of Census, U.S. Department of Commerce *Statistical Abstract of the United States: 1994* (1994).

**33.** The unprecedented increase in juvenile crime—particularly violent juvenile crime—in the United States and in South Carolina is well documented. In the ten-year period between 1982 and 1991, the number of juvenile arrests for murder in the United States increased by ninety-three percent and aggravated assault arrests increased by seventy-two percent. Office of . Justice Programs, U.S. Department of Justice, . *Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders* 2 (1994). In South Carolina, violent juvenile crime increased one hundred and forty-nine percent between 1988

and 1992 alone.` Uniform Crime Reports Division, South Carolina Law Enforcement Division, *Crime In South Carolina 1993.*

**34.** As depicted on Tables 1 and 2, only 13 of the 716 juveniles at DJJ as of May 4, 1994 were committed for what were described at trial as the "lightweight" offenses of truancy, shoplifting, and running away from home. None of the juveniles was incarcerated for being incorrigible.

**35.** A recently passed law will prohibit family court judges from sentencing juveniles to DJJ for contempt of court. *See* Act of June 2, 1994, Act No. 7, § 75, 1995 S.C. Acts ——, —— (effective Jan. 12, 1995, without signature of the Governor) (to be codified at S.C.Code Ann. § 20-7-2205). In the past, family court judges have occasionally used their contempt power to commit juveniles for repeated episodes of what are generally termed "status" offenses—running away from

Most of the juveniles who are not classified by DJJ as violent or serious offenders have nevertheless demonstrated severe antisocial conduct dangerous to the general public.

As an additional reason for declining to order a release of juveniles, an outright release of juveniles to their homes would not serve the rehabilitative goal enunciated by the Children's Code. The parties have argued, and the experts have suggested, that juveniles released pursuant to an order of this court could be sent to "community based" facilities to assist them with their reintegration into society. In fact, DJJ has precious few such community-based programs in place,[36] and those that are in operation are, like the long-term facilities, stretched to the limit. The evidence disclosed that, outside of the Columbia campuses, DJJ has available a total of ninety-six group home beds, sixty long-term foster care beds, and one hundred and ten marine institute beds. These facilities are all operating at maximum capacity levels. Moreover, a large percentage of these slots are in facilities that are owned and operated by private groups who have contracted with DJJ to provide services to a small number of juveniles who meet stringent eligibility criteria. In short, the limited number of community-based programs presently available—all of which are operating at capacity levels—are not capable of absorbing additional juveniles released from the long-term institutions.

Because these community-based alternative programs are operating at full capacity, if the court were to order a release of juveniles from the long-term facilities, the court would, for all practical purposes, be ordering an outright release of juveniles to their homes without even minimal efforts at supervision or rehabilitation. Such a practice would disserve juveniles who would then receive even less rehabilitation than they are currently receiving at DJJ long-term facilities. If this court accepts, as it must, the proposition that the overriding purpose of juvenile commitment in South Carolina is rehabilitation, then the court may not order an outright release of juveniles as a constitutional remedy when such a release would serve no rehabilitative purpose.

Moreover, this court cannot ignore what the Supreme Court has described as the "legitimate and compelling state interest in protecting the community from crime." *Schall v. Martin*, 467 U.S. 253, 264–65, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984). As the Supreme Court noted in *Schall*, the harm suffered by a violent crime victim "is not dependent upon the age of the perpetrator." *Id.*[37]

home, truancy, and incorrigibility. The new legislation simply imposes an absolute prohibition against such contemners being placed at DJJ facilities. It provides no alternative placement options for family court judges. Because there are so few contemners currently occupying beds at DJJ, the new law's effect on overcrowding will be negligible.

**36.** The community-based programs, such as DJJ's group homes and the Marine Institute (run by a private company under a contract with DJJ), are not within the scope of this litigation.

**37.** Included among the Plaintiffs in this case is a juvenile who wrote the following letter to Donald "Pee Wee" Gaskins. At the time, Gaskins was a death-row inmate at one of South Carolina's adult prisons:

Mr. Gaskins: June 9, 1991

Howdy! Let me start off by saying my name. My name is \*\*\*\*\*\*\*. I want you to know that you are my hereo [sic] and I admire you very much. I don't care what everybody says about you, but your [sic] the coolest mass murderer I know of. I like your style, background and everything else. I just hope your [sic] not a fag or a Yankee. Let me tell you some things about me before I go on. I'm 14 years old ... and I live in \*\*\*.... I'm at DYS at Willow Lane for a sexual crime with a female. She called rape on me, I'm goind [sic] to kill her and her family when I get out. I've killed before but someone else got the rap for it. I work under Brains. I don't put up with bulls\*\*\* either. But back to you. I heard that your [sic] out of appeals and there [sic] thinking of throwing the switch on you. I'd hount [sic] the f\*\*\*\*\*\* if they did that to me. Then when they died, beat them all the way to hell.

Maybe you should kill someone else so it would take longer for them to turn you into a chicken. Fry a police man. They'll take time to trial [sic] you on that one. Maybe tie him up and put some TNT around his neck and fix it up so you can go back a couple of steps and watch him get his head bounced around the walls. I wish I could see that. I'd laugh like a motherf\*\*\*....

See Ya

Your not so secret admire [sic]

\*\*\*

For all of the foregoing reasons, the court must to reject any effort to relieve overcrowding that relies upon the simplistic and unwise approach of releasing juveniles back to their communities in an effort to reduce population to the design capacity of the DJJ physical plant constructed in the 1970s. Rather, the court must order the Defendants to construct additional facilities to house juveniles who are committed to DJJ. Because it is well established that the state should be given considerable latitude in developing an appropriate remedial plan, the court will allow the Defendants to decide whether these additional facilities should be comprised of additional dormitories at the central location in Columbia or decentralized, community-based correctional programs throughout South Carolina.

Most of the witnesses who testified at trial advocated a decentralized approach. In fact, most experts in the field of juvenile corrections agree that decentralized alternative facilities are more effective at reducing recidivism. Although regional facilities may be more expensive to maintain, juveniles who are housed at decentralized alternative facilities, such as group homes, may be eligible for federal medicaid funds and other programs that could reduce the impact on the DJJ budget.[38] Additionally, decentralized facilities can serve as multi-purpose operations, such as "stepdown programs" or halfway houses for juveniles returning to their communities after confinement at the long-term institutions, or perhaps as alternative sites for lightweight offenders who need to be confined in a less restrictive environment for a relatively short period of time.[39]

Two recent studies in South Carolina have advocated decentralizing juvenile correctional facilities in an effort to move to community-based programs. Specifically, the Juvenile Justice Task Force Report strongly advocates the decentralization of correctional facilities and the use of innovative community-based corrections approaches in an effort to stem the rising tide of juvenile crime in South Carolina. The Task Force concluded that "large, centralized facilities ... are inherently less effective than smaller, regional facilities in altering juvenile behavior." *Juvenile Justice Task Force, Report, supra*, at 17.[40]

Similarly, in a 1992 report prepared at the request of DJJ, Rosser Fabrap, a private consulting group, recommended building three regional youth centers—each in two phases—to deal with the problem of juvenile delinquency and overcrowding in South Carolina. The Rosser Fabrap report was the product of an intensive study of juvenile crime trends in South Carolina and of the facilities currently available at DJJ.

Several countervailing considerations militate in favor of additional facilities at the DJJ Columbia campus. First, the department already owns 200 acres of land, most of it behind an escape-resistant fence, and the addition of dormitories and related facilities to this campus would benefit from economies of scale. Furthermore, because South Carolina is a relatively small state, families of juveniles can travel a fairly short distance to visit their children at the Columbia campus. Many states, such as New York, Texas, and California, that have moved to decentralize their juvenile correctional facilities have done so in an effort to place the facilities nearer to

---

**38.** The recently passed Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (effective Sept. 13, 1994), contains provisions for federal grants to states to implement community-based correctional facilities for juveniles. *E.g., id.* § 30701(a), 108 Stat. at 1855.

**39.** Regional facilities could also be used for status offenders and contemners who are now prohibited by law from being confined at DJJ's Columbia facilities. *See supra* note 38; *see also* H.R.J.Res. 434, 110th Leg., 2d Sess., 1994 S.C. Acts 4811, 4812 (effective May 27, 1994) (recom-

mending that DJJ evaluate facilities vacated by base closings in the state for possible use as residential facilities for shock incarceration and job training programs for nonviolent juveniles between the ages of fifteen and eighteen).

**40.** The neighboring state of Georgia has opted to decentralize its juvenile facilities. In Georgia, there are twenty-one short-term regional youth detention centers operating in eight regions (twenty are state operated; one is operated by Fulton County and is partially state subsidized). In addition, Georgia maintains four long-term centers, known as Youth Development Centers.

the homes of juveniles. Obviously, this is not as significant a factor in South Carolina.

In any event, this court will not attempt to suggest to the Defendants which approach is preferable. Decisions about the type, location, and structure of additional facilities are quintessentially decisions that should be made by the state's elected policymakers, not by this court.[41] For now, this court will simply declare that the juvenile population at the three long-term DJJ facilities is unconstitutionally overcrowded and will allow the Defendants a reasonable opportunity to develop a plan to alleviate the overcrowding. This plan should not include an outright release of juveniles to their homes. The court declines to establish a minimum square-footage requirement per juvenile, because the Supreme Court has indicated that a rigid mechanical test is inappropriate. As this court has noted, overcrowding may be determined only in light of many conditions of confinement, such as time spent outside of the room, the types of programs in place, and the amount of common area available. When the remedial plan required by this order is submitted to the court, the court will review the overcrowding question, as it should be reviewed, within the broader context of the overall remedial plan submitted.

In addition, the court finds that staffing levels at DJJ facilities, like the physical plant, are geared towards the needs of the 1970s era. As new facilities are constructed, DJJ must employ sufficient numbers of appropriately trained staff (including juvenile correctional officers, social workers, and psychologists) to adequately supervise and rehabilitate juveniles committed to the custody of DJJ. Like the issue of overcrowding, staff ratios may not be examined in a vacuum, but must be considered in the context of the overall conditions and programs at DJJ facilities. For this reason, the court will decline to impose rigid mathematical formulae on the Defendants, but will instead allow the Defendants to submit a staffing proposal, which will be considered in the context of the overall remedial plan to be implemented in this case.

## CONCLUSIONS OF LAW

This court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343(a)(3), and declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed.R.Civ.P. 65.

### A. The Constitutional Standard

Courts around the country are not in agreement as to the appropriate federal standard by which to judge state juvenile detention facility conditions. The Seventh Circuit has applied the cruel and unusual punishment test of the Eighth Amendment. *Nelson ex rel. Nelson v. Heyne,* 491 F.2d 352, 355 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *cf. Morales v. Turman,* 562 F.2d 993, 998–99 (5th Cir.1977) (in dictum, expressing doubt about juveniles' right to treatment under the Due Process Clause, but recognizing that the Eighth Amendment may afford relief to the plaintiffs). The First, Ninth, Tenth, and Eleventh Circuits have applied the Due Process Clause of the Fourteenth Amendment. *Gary H. v. Hegstrom,* 831 F.2d 1430, 1431–32 (9th Cir.1987); *H.C. ex rel. Hewett v. Jarrard,* 786 F.2d 1080, 1084–85 (11th Cir.1986); *Santana v. Collazo,* 714 F.2d 1172, 1179 (1st Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *Milonas v. Williams,* 691 F.2d 931, 942 & n. 10 (10th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983). The United States Supreme Court has not decided the issue. *See, e.g., Ingraham v. Wright,* 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711 (1977) (expressly reserving

---

**41.** In the crime bill that became effective on January 12, 1995, the South Carolina General Assembly apparently expressed its preference for decentralized juvenile correctional facilities. *See* Act of June 2, 1994, Act No. 7, § 63(1), 1995 S.C. Acts ——, —— (effective Jan. 12, 1995, without the signature of the Governor). Although neither party in this case brought this provision to the court's attention, the Act directs the Department of Juvenile Justice to develop a long-term plan to decentralize the DJJ "facilities in Columbia and reduce the number of secure beds utilized for nonviolent, nonrepeat offenders through the use of programs involving more intense supervision and treatment services at the community level." *Id.*

the question whether the Cruel and Unusual Punishment Clause applies to juvenile institutions).

▮ After reviewing these authorities, the court has determined that the Due Process Clause of the Fourteenth Amendment, which implicitly encompasses the protections of the Eighth Amendment, is the appropriate standard for reviewing the conditions at the DJJ facilities. Adoption of the more stringent Due Process Clause is appropriate in this case because the juveniles incarcerated at DJJ facilities have, with few exceptions, not been convicted of a crime; rather, they have merely been adjudicated to be juvenile delinquents. See Santana, 714 F.2d at 1179 ("[J]uveniles ... who have not been convicted of crimes[ ] have a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals."); cf. Ingraham v. Wright, 430 U.S. at 671–72 n. 40, 97 S.Ct. at 1412–13 n. 40 ("Eighth Amendment scrutiny is appropriate only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions.").

South Carolina law clearly establishes that the purpose of confining juveniles who violate the law is not to punish them, but to provide training and services to correct their delinquent behavior—that is to say, to rehabilitate them. For example, the Children's Code, the statutory authority for confining juveniles at DJJ facilities, declares as a part of its "Children's Policy" that "[f]or children in need of services, care and guidance, the State shall secure those services as are needed to serve the emotional, mental and physical welfare of the children and the best interests of the community." S.C.Code Ann. § 20–7–

20(D) (Law.Co-op.1985). Furthermore, this policy applies to "children ... who by their circumstance or action violate the laws of this State and are found to be in need of treatment or rehabilitation." S.C.Code Ann. § 20–7–20(B) (Law.Co-op.1985).[42]

In Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Supreme Court held that, in the noncriminal setting, there must be a relationship between the purpose for which an individual's liberty is taken and the treatment provided to that person. In Jackson, a case involving a mentally retarded individual, the Court stated: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Id. at 738, 92 S.Ct. at 1858.

▮ Numerous district courts have relied upon the rationale employed by the Supreme Court in Jackson to hold that where, as in South Carolina, the purpose of incarcerating juveniles in a state training school is treatment and rehabilitation, the Due Process Clause "requires that the conditions and programs at the school must be reasonably related to that purpose." Morgan v. Sproat, 432 F.Supp. 1130, 1135 (S.D.Miss.1977); see also Martarella v. Kelley, 349 F.Supp. 575, 585 (S.D.N.Y.1972) ("Where the State, as parens patriae, imposes such detention, it can meet the Constitution's requirement of due process ... if, and only if, it furnishes adequate treatment to the detainee."); Pena v. New York State Div. for Youth, 419 F.Supp. 203, 206–07 (S.D.N.Y.1976). But see Santana v. Collazo, 714 F.2d at 1176–77 (refusing to recognize constitutional right to rehabilitative treatment for juveniles); Morales v. Turman, 562 F.2d 993, 997–98 (5th Cir.1977) (same).[43]

---

42. The overriding goal of juvenile rehabilitation was recognized by the Supreme Court in Kent v. United States, 383 U.S. 541, 554–55, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966):

The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is par-

ens patriae rather than prosecuting attorney and judge.

43. Traditionally, courts that have recognized a constitutional right to rehabilitative treatment for incarcerated juveniles have generally employed two basic theories to divine such a right. These theories were initially developed in the context of mentally ill or retarded persons committed to state mental institutions or hospitals. Courts extended these theories to the context of juvenile delinquents incarcerated in training schools, be-

In addition, the Due Process Clause guarantees to juveniles who are incarcerated

cause juveniles, like mentally incompetent or retarded individuals, generally fall within the same *parens patriae* authority of the state. *See generally Santana v. Collazo,* 533 F.Supp. 966, 972 (D.P.R.1982) (discussing the development of the "right to treatment" theories, although eventually rejecting them), *aff'd,* 714 F.2d 1172 (1st Cir. 1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984).

The first theory, which is adopted by this court, finds support in the Supreme Court's pronouncement in *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." As stated previously, when a state incarcerates juveniles for the purpose of treatment or rehabilitation, as does South Carolina, due process requires that the conditions of confinement be reasonably related to that purpose. *See, e.g., Morgan v. Sproat,* 432 F.Supp. at 1135–36.

The second theory is known as the *quid pro quo,* or mutual compact, theory. Under this approach, courts have held that states are required to rehabilitate incarcerated juveniles as consideration for affording juveniles fewer procedural safeguards than those afforded to adult criminal defendants. In other words, the *quid pro quo* theory provides that because juvenile delinquency proceedings generally do not involve the full range of procedural due process protections of a criminal trial, the state must provide rehabilitation to incarcerated juveniles to make up for the difference. *See generally Santana,* 533 F.Supp. at 969–70 (discussing the *quid pro quo* theory, although eventually rejecting it).

The validity of the *quid pro quo* theory is now quite suspect. In *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), Chief Justice Burger's concurring opinion specifically rejects the theory. 422 U.S. at 585–89, 95 S.Ct. at 2498–2500 (Burger, C.J., concurring). *O'Connor* involved an action under 42 U.S.C. § 1983 by a former patient of a state mental hospital who was confined to the hospital for almost fifteen years. The Court held that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members and friends." *Id.* at 576, 95 S.Ct. at 2494. Although the Court declined to reach the more difficult constitutional issues relating to a confined individual's right to treatment, *id.* at 573, 95 S.Ct. at 2492, Chief Justice Burger in his concurring opinion specifically disposed of the respondent's arguments for a constitutional right to treatment.

In *O'Connor,* Chief Justice Burger analyzed the court of appeals' statement that " 'where ... the rationale for confinement is the *"parens patriae"* rationale that the patient is in need of treatment, the due process clause requires that minimally adequate treatment be in fact provided.' " 422

U.S. at 581, 95 S.Ct. at 2496 (quoting circuit court opinion). Significantly, though, the Chief Justice did not question the principle that one who is committed specifically for purposes of treatment is entitled under the Due Process Clause to minimally adequate treatment. Rather, he merely challenged the lower court's assumption that the respondent's need for treatment was the sole rationale for his commitment. As Chief Justice Burger noted, the state statute authorizing commitments did not require that a patient be treated. However, because the court of appeals did not explain its conclusion that the respondent was committed solely because he needed treatment, Chief Justice Burger determined that "the premise of the Court of Appeals' first theory must have been that, at least with respect to persons who are not physically dangerous, a State has no power to confine the mentally ill except for the purpose of providing them with treatment." *Id.* Burger concluded that this premise is flawed because the state's traditional authority as *parens patriae* allows it to confine individuals for reasons other than treatment, such as providing them with a more humane place of confinement. *Id.* at 581–82, 95 S.Ct. at 24.

In *Santana v. Collazo,* 714 F.2d 1172 (1st Cir. 1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984), the First Circuit Court of Appeals applied Chief Justice Burger's concurring opinion in *O'Connor v. Donaldson* and concluded (as did the district court below) that no constitutional right to rehabilitation exists for incarcerated juvenile delinquents. 714 F.2d at 1176–77; *see also Morales v. Turman,* 562 F.2d 993, 997–98 (5th Cir.1977) (in dictum, rejecting constitutional right to treatment for juvenile offenders). The court of appeals in *Santana* rejected both theories described above and held that juveniles incarcerated under the state's *parens patriae* authority have no due process right to treatment, because the state "may legitimately confine individuals solely to protect society from them." 714 F.2d at 1176.

This court agrees that the *quid pro quo* doctrine is no longer valid in light of the Chief Justice's concurring opinion in *O'Connor.* However, the *Santana* court seems to have read the Burger concurrence too broadly with regard to the first theory. Although Chief Justice Burger recognized in *O'Connor* that states may confine individuals for reasons other than to provide treatment, he did not state that individuals who are confined for purposes of treatment have no constitutional right to receive that treatment. Indeed, such a pronouncement would apparently run afoul of the Supreme Court's mandate in *Jackson v. Indiana, supra,* that nature of confinement be reasonably related to the purpose of the confinement.

Accordingly, because South Carolina's policy behind incarcerating juvenile delinquents is to provide them with rehabilitation, the court has determined that the juveniles at DJJ are entitled under the Constitution to rehabilitative treatment.

the right to reasonably safe conditions of confinement, freedom from unreasonable bodily restraint, and minimally adequate training to protect those interests. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).[44]

Safety, in the context of this case, encompasses the Plaintiffs' right to reasonable protection from the aggression of others, whether "others" be juveniles or staff. *Thomas S. ex rel. Brooks v. Flaherty,* 699 F.Supp. 1178, 1200 (W.D.N.C.1988), *aff'd,* 902 F.2d 250 (4th Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990).

■ The interest in freedom from unreasonable bodily restraint includes freedom from unnecessary bodily restraint through mechanical devices as well as unreasonably restrictive conditions of confinement. Unreasonably restrictive conditions of confinement are those which unduly restrict the juveniles' freedom of action and are not reasonably related to legitimate security or safety needs of the institution.

The right to minimally adequate training is more difficult to define. As noted by the Supreme Court in *Youngberg:*

> It is not feasible ... to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case.

457 U.S. at 319 n. 25, 102 S.Ct. at 2460 n. 25. Additionally, as noted by the *Youngberg* court, when a court is called upon to decide what is reasonable under the circumstances presented, the court

> must show deference to the judgment exercised by a qualified professional. ...

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462.

■ The court must emphasize that its role in this litigation is to identify minimally acceptable standards for treatment and rehabilitation. In other words, it is not necessary that the state provide the best possible services and training available to the Plaintiffs. The test in this case is whether the state is providing minimally adequate or reasonable services and training necessary to ensure the protected interests of the Plaintiffs. It is not appropriate that the state be held to a standard which imposes an affirmative duty to succeed in the purpose of correcting the juveniles' behavior. Although such a standard may be desirable, it is not constitutionally mandated. All that is required is that the juveniles be housed under conditions that provide them with a reasonable opportunity to correct their behavior. Obviously, this standard incorporates the security, program, and service functions that are basic to juvenile corrections. These basic services include sufficient numbers of adequately trained staff so that the purpose of the confinement may be advanced, minimal levels of programming reasonably geared toward aiding juveniles to correct their behavior, and other services that are minimally necessary to give the Plaintiffs a reasonable opportunity to accomplish the purpose of the confinement while protecting the other recognized interests in safety and reasonable restraint.

In deciding minimum constitutional requirements for the institutions under challenge here, this court is not bound by standards promulgated by organizations such as

---

**44.** *Youngberg,* like *Jackson,* involved a challenge by a mental retardate to the conditions of his confinement. Although *Youngberg* is not squarely applicable to juveniles, this court has determined that the *Youngberg* analysis is appropriate in a juvenile correctional setting because juvenile delinquents, like mental retardates, have been deprived of their liberty because of their status. Additionally, the three parts of the *Youngberg* test are all based upon a determination of what is reasonable under the circumstances—an elastic concept that allows for appropriate adjustments in view of the fact that some juvenile delinquents have demonstrated a propensity toward violence.

the American Correctional Association. As noted by the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 543 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979), "[W]hile the recommendations of these various groups [including the American Correctional Association] may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." [45] Lower courts have also rejected efforts to impose ACA standards as constitutional minima. For example, in *Gary H. v. Hegstrom*, 831 F.2d 1430 (9th Cir.1987), the district court entered a decree establishing, on federal constitutional grounds, guidelines for managing a facility for adolescent wards for the juvenile court. In so doing, the court relied upon expert testimony and the standards for incarceration adopted by professional associations. The Ninth Circuit Court of Appeals rejected the district court's "wholesale adoption of various professional associations' concepts for model institutions." *Id.* at 1433. The court determined that these standards were not constitutionally mandated and concluded that the trial court's order "far exceed[ed] anything remotely required by the fourteenth amendment." *Id.; see also Miles v. Bell*, 621 F.Supp. 51, 60 (D.Conn. 1985) ("Although the ACA and APHA standards constitute appropriate goals formulated by experts in the field, and may provide guidance for prison administrators or other branches of the government, they do not establish constitutional minima.") (citing *Rhodes v. Chapman*, 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981), and *Bell v. Wolfish*, 441 U.S. at 543–44 n. 27, 99 S.Ct. at 1876–87 n. 27). The court must, therefore, reject the invitation by the Plaintiffs and the Defendants in this action to adopt ACA standards for purposes of fashioning relief in this case.

Similarly, this court is not bound to accept the recommendations of all the expert witnesses who have testified in this case. In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct.

2392, 69 L.Ed.2d 59 (1981), the Supreme Court cautioned against "assuming that opinions of experts as to desirable prison conditions suffice to establish [Constitutional standards]." *Id.* at 348 n. 13, 101 S.Ct. at 2400 n. 13. Although *Rhodes* involved a constitutional challenge to conditions encountered by adult prison inmates subject only to the Eighth Amendment's prohibition of cruel and unusual punishment, the rationale underlying the quoted portion of the *Rhodes* decision is applicable here: This court must be the final arbiter of minimum constitutional standards, and although opinions of experts in the field are helpful, they are not binding on the court.

■ As to the discrete issue of overcrowding, the number of square feet allotted to each juvenile is not determinative of the constitutionality of the available space. Other factors, such as the amount of common area available and the amount of time spent outside the cells, must also be considered. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir.), *amended in part and vacated in part*, 688 F.2d 266 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir.1977); *Stewart v. Gates*, 450 F.Supp. 583 (C.D.Cal. 1978); *Rutherford v. Pitchess*, 457 F.Supp. 104 (C.D.Cal.1978); *Jordan v. Wolke*, 460 F.Supp. 1080 (E.D.Wis.1978), *rev'd*, 615 F.2d 749 (7th Cir.1980).

Finally, in fashioning relief in this case, the court must be mindful of the Supreme Court's admonition that

The "legitimate and compelling state interest" in protecting the community from crime cannot be doubted. [The Supreme Court has] stressed before that crime prevention is "a weighty social objective," and this interest persists undiluted in the juvenile context. The harm suffered by the victim of a crime is not dependent upon the age of the perpetrator. And the harm to

---

**45.** *Bell* involved a constitutional challenge to conditions of confinement brought by pretrial detainees. Although the case did not involve juvenile correctional facilities, the Court in *Bell* was called upon to establish constitutional mini-

mum standards for pretrial detainees who are protected, as are the Plaintiffs in this litigation, by the Due Process Clause. 441 U.S. at 536, 99 S.Ct. at 1872.

society generally may be even greater in this context given the high rate of recidivism among juveniles. *Schall v. Martin*, 467 U.S. 253, 264–65, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984) (citations omitted). In *Schall*, the Court upheld, against a constitutional challenge, a New York law requiring the pretrial detention of all juveniles arrested for committing an offense. In doing so, the Court stressed that the importance of crime prevention outweighed the statute's punitive effects, especially in light of the high recidivism rate among juveniles.[46]

## B. The Statutory Standards

Juveniles attending the training schools operated by DJJ are potentially covered by three federal education statutes: the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

## IDEA

■ The purpose of the IDEA is "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). For purposes of the IDEA, the term "children with disabilities" is defined to include children

(i) with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health im-

pairments, or specific learning disabilities; and

(ii) who, by reason thereof, need special education and related services.

20 U.S.C. § 1401(a)(1)(A). "Special education" has been defined to include "[i]nstruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." 34 C.F.R. § 300.17(a)(1)(i).

To be eligible for federal assistance under the IDEA, states must ensure that a "free appropriate public education" is available to meet the child's identified needs. 20 U.S.C. § 1412(2)(B); 34 C.F.R. § 300.121. The state must have a policy in effect to identify, locate, and evaluate children who have a disability or who are suspected of having a disability. 20 U.S.C. § 1412(1) & (2)(C); 34 C.F.R. § 300.128.

The IDEA provides that

[t]he State educational agency shall be responsible for assuring that the requirements of [IDEA] are carried out and that all educational programs for children with disabilities within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for children with disabilities in the State educational agency and shall meet educational standards of the State educational agency.

20 U.S.C. § 1412(6); *see also* 34 C.F.R. § 300.600. The regulations make it clear that the reference to "all programs" includes state correctional facilities and that the requirements of the IDEA apply to such facilities. 34 C.F.R. § 300.2(b)(4).

---

46. In *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Supreme Court quoted with approval the following passage from a 1967 report of a presidential task force:

The spirit that animated the juvenile court movement was fed in part by humanitarian compassion for offenders who were children.... [This compassion] should [not] be allowed to outrun reality. The juvenile court is a court of law, charged like other agencies of criminal justice with protecting the communi-

ty.... The juvenile court, like other courts, is therefore obliged to employ all the means at hand, not excluding incapacitation, for achieving that protection. What should distinguish the juvenile from the criminal courts is greater emphasis upon rehabilitation, not preoccupation with it.
403 U.S. at 546 n. 6, 91 S.Ct. at 1986 n. 6 quoting President's Commission on. Law Enforcement and Administration of Justice, *Task Force Report: Juvenile Delinquency and Youth Crime* 9 (1967)).

## Section 504

 Section 504 provides that no otherwise qualified individual with a disability shall, solely because of that disability, be excluded from participation in or subject to discrimination "under any program or activity" receiving federal financial assistance. The phrase "programs or activity" includes all of the operations of a department, agency, special purpose district, or other instrumentality of a state or local government. 29 U.S.C. § 794(b)(1)(A). Therefore, the requirements of Section 504 are similarly applicable to the children with disabilities located in the correctional facilities of DJJ.

The centerpiece of the IDEA and Section 504 is the "Individualized Education Program" or IEP. See 20 U.S.C. §§ 1401(a)(20), 1414(a)(5). Each public agency is responsible for initiating and conducting meetings for the purpose of developing, reviewing, and revising the IEP of a child with a disability. The meeting to develop an IEP for a child must be held within 30 calendar days of a determination that the child needs special education and related services. The IEP must be implemented as soon as possible following the meetings to develop or revise the IEP. 34 C.F.R. § 300.342. A meeting must be held to review and, if appropriate, revise each child's IEP periodically, but not less than annually. 20 U.S.C. § 1414(a)(5); 34 C.F.R. § 300.343. The IEP must be in effect at the beginning of each school year and before special education and related services are provided to a child. When a child moves to a new school district, a new IEP must be formulated and implemented.

Because DJJ is an independent school district, the reassignment of a juvenile from his or her home school district to DJJ facilities triggers the obligation by DJJ to screen the juvenile for special education needs and, if necessary, develop a new IEP for the juvenile. · Development of appropriate IEP's for these juveniles has proved to be extremely difficult for DJJ, often for reasons beyond its control. First, the school districts from which the juveniles are transferred have of-

ten refused to send the juveniles' school records to DJJ, citing the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232 ("FERPA"). Without the school records, DJJ educators are unable to properly develop an IEP. Secondly, South Carolina Department of Education officials who audit DJJ schools have mandated that DJJ formulate not one, but two IEPs for the juveniles: one when the juvenile is received at the Reception and Evaluation Center and a second IEP if and when the juvenile is later confined to one of the three long-term institutions.

As noted previously, by state law, a juvenile's stay at the Reception and Evaluation Center may not exceed forty-five days, and, at the time of trial, the average stay was twenty-one days. The requirement imposed by the South Carolina Department of Education that a new IEP be developed for the juvenile's relatively brief stay at the Reception and Evaluation Center is a burdensome one. The IEP planning meeting cannot occur until the juvenile has been at the facility at least seven days, because the parents of the juvenile must be given seven days advance notice of the meeting.[47] Thus, for juveniles at the Reception and Evaluation Center, even under the best of circumstances, the new IEP would be of short duration. Moreover, the majority of juveniles who are evaluated at the Reception and Evaluation Center do not matriculate to the long-term institutions. Just over two thousand juveniles pass through Reception and Evaluation each year, but only approximately half of them end up in the long-term institutions. The South Carolina Department of Education's requirement that new IEP's be formulated for the two thousand Reception and Evaluation juveniles—most of them to be implemented for a mere fourteen days on average—struck the court as one elevating form over substance.

At trial, it became apparent to the court that these two problems have caused a tremendous drain on the resources and staff of DJJ officials and have prevented them from

---

**47.** Testimony at trial indicated that DJJ must exert considerable effort to arrange for the parental meeting: letters are often returned undelivered, and parents often refuse to attend the meetings.

doing an adequate job of developing IEPs for juveniles who are committed to the long-term institutions and who undoubtedly need these programs.[48] The court suggested that some method be devised by which DJJ would not be required to develop IEPs for the juveniles during their short stay at the Reception and Evaluation Center; however, the Plaintiffs maintain, as they have throughout this litigation, that the IEPs are required by federal law for these juveniles as well as for those who are ultimately confined to the long-term institutions.

After the trial was concluded, this court contacted the United States Department of Education to determine whether any type of administrative solution to these two problems was available. The Department has responded by way of an interpretative memorandum sent to this court from the United States Department of Justice, Civil Rights Division. The memorandum has been made a part of the record in this case. In its memorandum, the Department of Education observes that "[n]either Section 504 of the Rehabilitation Act of 1973 nor IDEA specifically addresses the question of what services a child with a disability is to be provided in the interim period [while confined at the Reception and Evaluation Center], before a new IEP is developed and implemented [at the long-term facilities.]" Statement of Interest of the U.S. Dep't of Education 4 (Nov. 30, 1994). After examining the relevant law, the Department of Education concluded:

> In the case of short-term, temporary confinement, the State may meet its obligation under IDEA and Section 504 ... by implementing the IEP from the previous school district or placement instead of developing a new one. The IEP must be implemented to the extent possible in the temporary setting. To the extent the implementation of the old IEP is impossible, services that approximate, as close as possible, the old IEP must be provided.

*Id.* at 5–6.

■ This court adopts the conclusion reached by the Department of Justice and will, for this reason, not require that a new IEP be developed for juveniles who are incarcerated at the Reception and Evaluation Center. Rather, the IEP formulated by the transferor school district must be utilized and implemented, to the extent possible. A new IEP must, however, be formulated in accordance with the statutory law if and when the juvenile is later sent to one of the three long-term institutions.

The Department of Justice memorandum also indicates that school districts around South Carolina have erroneously concluded that FERPA prevents them from sending school records to DJJ without the consent of the parents of the juveniles affected. The memorandum states:

> [A]n educational agency or institution may disclose education records, or personally identifiable information from education records, without prior consent if the disclosure is, subject to the requirements of § 99.34, to officials of another school ... where the student seeks or intends to enroll.

*Id.* at 6.

The memorandum further indicates that the school district sending the records must make a reasonable attempt to notify the parent or eligible student of the fact that the records have been forwarded and, upon request, must send to the parent or student a copy of the records that were disclosed.

■ In an effort to eliminate this problem, the court will require the Defendants to disseminate the relevant portions of this order, together with the Department of Justice memorandum, to all school districts in South Carolina so that it will be clear in the future that neither parental nor juvenile consent is required for the school districts to forward school records to DJJ when a juvenile is confined there. The only obligations upon transferor school districts are the obligations to provide reasonable notice to the parent that the student's records have been transferred and, if requested, to provide copies of the records that have been sent.

---

**48.** As noted previously in the court's Findings of Fact, a disproportionate number of juveniles confined to the long-term institutions are in need of special education services.

The evidence at trial disclosed that in some cases, the Defendants have not adequately identified, located, and evaluated children with disabilities who are in need of special education and related services. The evidence also indicated that, in some cases, appropriate IEPs were not developed for those juveniles that were identified. Finally, the evidence disclosed that, at least in some cases, the IEPs that were developed were not fully implemented. As noted above, much of the difficulty the Defendants have experienced in fully complying with the mandates of the IDEA and Section 504 stems directly from the lack of cooperation from local school districts and from the onerous requirement that IEPs be formulated for juveniles during their short stay at the Reception and Evaluation Center. Now that these two obstacles have been removed, the court must expect the Defendants to bring themselves into strict compliance with the IDEA and Section 504.

### ADA

Congress enacted the ADA on July 26, 1990 to eliminate all forms of discrimination against individuals with disabilities. Through this legislation, the federal government extended the nondiscrimination principles of the Rehabilitation Act, applicable to institutions receiving federal funds, to a much wider array of institutions, including programs and services provided by all units of state and local government. The ADA was intended to, and does, build upon the protections afforded disabled persons under federal, state, or local laws. See 42 U.S.C. § 12201.

Under subchapter II of the ADA, which applies to public entities, "no qualified individual with a disability shall, by reason of such disability, be excluded from participating in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Under the ADA, "disability," with respect to an individual, means a physical or mental impairment that substantially limits one or more of the major life activities of such individuals. 28 C.F.R. § 35.104 (1993); 45 C.F.R. § 84.3(j)

(1993). As the Defendants have conceded, the facilities at DJJ are subject to the requirements of the ADA and the regulations promulgated thereunder.

With respect to the educational component of DJJ, the parties have not demonstrated, nor could this court discern, any additional requirements imposed by the ADA beyond those imposed by Section 504 and the IDEA.

The more familiar provisions of the ADA relate to barrier-free architectural design requirements. DJJ is subject to the physical and programmatic accessibility requirements applicable to governmental entities under subchapter II of the Act, 28 C.F.R. pt. 35, subpt. D. Indeed, the Defendants have conceded that the ADA barrier-free requirements apply to DJJ facilities.

The evidence at trial disclosed several isolated, often technical, violations of the IDEA, Section 504, and the ADA that apparently produced no significant injury on a class-wide basis. Some of these violations resulted from confusion, on the part of the Defendants, as to whether they were subject to the provisions of these statutes. Now that the court has made it clear that all three laws apply to the facilities operated by DJJ, the court must expect full compliance in the future, and the court-appointed monitor designated to oversee the implementation of this order shall ensure that the statutory mandates are fulfilled.

### Remedial Plan

 Having determined that certain constitutional and statutory deficiencies exist at facilities operated by DJJ, the court must determine an appropriate method for devising and implementing a remedial plan. The Plaintiffs have invited the court to devise and impose a judicially created plan based on the record before it. The court has concluded, however, that it must first afford the state of South Carolina the opportunity to correct the deficiencies that have been brought to light by this litigation and identified in this order.

It is well settled that under principles of comity and federalism, this court must decline the Plaintiffs' invitation to impose a broad and sweeping remedy upon the Defendants, but must instead allow the Defendants

an opportunity to devise a plan of their own for remedying the constitutional violations. *See Chisom v. Roemer,* 853 F.2d 1186, 1192 (5th Cir.1988) ("It is now established beyond challenge that upon finding a particular standard, practice, or procedure to be contrary to either a federal constitutional or statutory requirement, the federal court *must* grant the appropriate state or local authorities an opportunity to correct the deficiencies."); *see also Faulkner v. Jones,* 10 F.3d 226, 240 (4th Cir.1993) (Hamilton, J., dissenting) ("Federal jurisprudence not only dictates, but demands that, upon finding a constitutional violation, federal courts must first afford the responsible state authorities an opportunity to devise and implement their own corrective action before imposing a judicially-created remedy.").

The doctrine of allowing a state the opportunity to correct constitutional deficiencies is particularly applicable when reviewing the adequacy of state correctional facilities. In *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the United States Supreme Court stated:

> It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.... The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.

*Id.* at 491–92, 93 S.Ct. at 1837–38.

The United States Court of Appeals for the Fourth Circuit has recently cautioned against federal courts "immers[ing] themselves in the management of state prisons or substitut[ing] their judgment for that of trained penological authorities charged with the administration of such facilities." *Taylor v. Freeman,* 34 F.3d 266, 268 (4th Cir.1994). In *Taylor,* the Fourth Circuit stated that "federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators." *Id.* at 269. The *Taylor* court re-versed a district court decision imposing, as the Plaintiffs would have the court do here, specific population ceilings and target dates for achieving them. The court of appeals observed that "sweeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts." *Id.* The Fourth Circuit indicated that the district court should have afforded the state of North Carolina the opportunity to correct the constitutional deficiencies before imposing a court-ordered remedial scheme.

Although both *Preiser* and *Taylor* involved adult prison settings, the principles of comity and federalism that underlie those decisions are no less applicable when a court reviews conditions of confinement of juveniles incarcerated at juvenile training schools.

Accordingly, the Defendants shall, within one hundred and twenty days from the date of this order, prepare and submit to the court a written plan designed to remedy the constitutional and statutory deficiencies identified herein. The court is mindful of the fact that the Defendants have already begun to develop—and in some cases, to implement—new programs designed to address some of the deficiencies. At trial, however, most of these programs were still in their formative stages. Some programs, such as the new admissions unit, were just being implemented as the testimony in the trial concluded; others, such as the new policy regarding the use of CS gas, were actually developed in the courtroom during the course of the trial; and others, such as the proposed contract with the South Carolina Department of Health and Environmental Control to operate the health care component at DJJ facilities, were still in the embryonic stages when the case was tried. The testimony about the scope and extent of these remedial programs was somewhat incomplete. Thus, although some of these programs that have been developed in response to this litigation may well pass constitutional muster, the court will be in a better position to review the adequacy of these programs, and others developed in accordance with this order, if they are presented in a formal, detailed, written plan.

## Appointment of Monitor

After an acceptable plan is developed, the court intends to appoint the Honorable Robert Burnside, a South Carolina family court judge, as its special master pursuant to Fed. R.Civ.P. 53, to oversee the implementation of the program. Judge Burnside has announced his intention to retire from the bench effective May 31, 1995. Judge Burnside is a former state legislator and an eighteen-year veteran of the family court bench. The court is confident that Judge Burnside's wealth of experience in dealing with juvenile justice issues will enable him to oversee the implementation of the remedial plan.

## Conclusion

For all of the foregoing reasons, the Defendants are hereby ordered to submit to the court, within one hundred and twenty days, a detailed plan to remedy the constitutional and statutory deficiencies identified in this order.

IT IS SO ORDERED.

## Table 1

The following table summarizes the most serious offense for which each juvenile at the DJJ long-term institutions was being confined as of May 4, 1994. The table, which was compiled by the court from the May 4, 1994 Daily Roster of DJJ, reflects only current commitments and includes only one offense per juvenile. Many of the juveniles have an extensive record of prior criminal offenses or were being confined for multiple charges; however, these two facts are not reflected in the table.

| Serious/Violent Offenses * | Birchwood | John G. Richards | Willow Lane | Total |
|---|---|---|---|---|
| Armed robbery | 32 | 8 | 6 | 46 |
| Assault (and battery) of a high and aggravated nature | 30 | 6 | 25 | 61 |
| Assault (and battery) with intent to kill | 20 | 5 | 11 | 36 |
| Assault with intent to commit criminal sexual conduct | 6 | 2 | 4 | 12 |
| Burglary, first or second degree | 29 | 53 | 33 | 115 |
| Criminal sexual conduct | 15 | 1 | 6 | 22 |
| Criminal sexual conduct with a minor | 12 | 8 | 25 | 45 |
| Drug trafficking | 0 | 1 | 1 | 2 |
| Involuntary manslaughter | 1 | 0 | 4 | 5 |
| Kidnapping | 2 | 0 | 3 | 5 |
| Lynching | 3 | 2 | 3 | 8 |
| Murder | 6 | 0 | 3 | 9 |
| Voluntary manslaughter | 0 | 3 | 3 | 6 |
| Other acts against persons | 0 | 0 | 1 | 1 |
| **Total Serious/Violent Offenses** | 156 | 89 | 128 | 373 |

| Other Offenses ** | Birchwood | John G. Richards | Willow Lane | Total |
|---|---|---|---|---|
| Accessory after the fact | 2 | 1 | 1 | 4 |
| Accessory before the fact | 7 | 1 | 2 | 10 |
| Arson, second degree | 0 | 0 | 2 | 2 |
| Assault on police officer while resisting arrest | 1 | 1 | 3 | 5 |
| Breaking into automobile or fuel tank | 0 | 4 | 1 | 5 |
| Burglary, third degree | 0 | 2 | 4 | 6 |
| Carrying pistol unlawfully | 3 | 2 | 4 | 9 |
| Carrying weapon on school grounds | 2 | 3 | 6 | 11 |

| Other Offenses ** | Birchwood | John G. Richards | Willow Lane | Total |
|---|---|---|---|---|
| Contempt of court ** | 0 | 24 | 16 | 40 |
| Criminal conspiracy | 0 | 1 | 1 | 2 |
| Criminal domestic violence. | 2 | 0 | 3 | 5 |
| Damaging property by explosive or incendiary device | 1 | 1 | 0 | 2 |
| Discharging firearm into dwelling | 4 | 1 | 1 | 6 |
| Displaying firearm in public building or adjacent areas | 1 | 0 | 1 | 2 |
| Failure to stop for blue light | 0 | 3 | 0 | 3 |
| Felony driving under the influence | 0 | 0 | 1 | 1 |
| Grand larceny | 1 | 5 | 1 | 7 |
| Grand larceny, automobile | 1 | 5 | 4 | 10 |
| Indecent exposure | 1 | 0 | 0 | 1 |
| Lewd act | 5 | 0 | 6 | 11 |
| Malicious injury to personal property | 0 | 0 | 2 | 2 |
| Malicious injury to real property | 0 | 0 | 2 | 2 |
| Parole violation ** | 5 | 8 | 3 | 16 |
| Pointing firearm | 4 | 0 | 2 | 6 |
| Possession of alcohol by minor | 0 | 1 | 1 | 2 |
| Possession of LSD or cocaine | 0 | 6 | 3 | 9 |
| Possession of LSD or cocaine with intent to distribute | 6 | 35 | 5 | 46 |
| Possession of sawed-off shotgun, rifle or machine gun | 2 | 0 | 1 | 3 |
| Possession of schedule I controlled substance (e.g., marijuana) | 0 | 2 | 1 | 3 |
| Possession of unlawful weapons | 4 | 0 | 1 | 5 |
| Possession with intent to distribute controlled substance in proximity of school | 0 | 1 | 0 | 1 |
| Probation violation ** | 13 | 13 | 16 | 42 |
| Public disorderly conduct | 0 | 0 | 1 | 1 |
| Public drunkenness | 0 | 0 | 1 | 1 |
| Purse snatching | 1 | 0 | 0 | 1 |
| Receiving stolen goods | 0 | 5 | 1 | 6 |
| Reckless homicide | 1 | 0 | 0 | 1 |
| Resisting an officer | 1 | 3 | 1 | 5 |
| Runaway | 0 | 0 | 1 | 1 |
| Shoplifting | 0 | 2 | 4 | 6 |
| Simple assault (and battery) | 9 | 1 | 5 | 15 |
| Strong-arm robbery | 10 | 2 | 1 | 13 |
| Trespass | 0 | 3 | 1 | 4 |
| Truancy | 0 | 0 | 1 | 1 |
| Use of car without owner's consent | 0 | 4 | 5 | 9 |
| **Total Other Offenses** | 87 | 140 | 116 | 343 |
| **Total Juvenile Population** | 243 | 229 | 244 | 716 |

* For purposes of statistical data, the Department of Juvenile Justice defines violent/serious offenses to include: murder; sexual conduct, first and second degree; assault and battery with intent to kill; kidnapping; voluntary manslaughter; armed robbery; arson first degree; burglary, first and second degree; drug trafficking; and all additional offenses categorized in the South Carolina Code of Laws as Acts Against Persons. Offenses included in the latter category are found in Chapter 3 of Title 16 of the South Carolina Code of Laws, S.C.Code Ann. § 16–3–10 et seq. (Law.Co-op.1985 & Supp.1993).

** For the offenses of contempt of court, parole violation, and probation violation, Table 2 immediately following this table summarizes the most serious offense for which the juvenile was originally sanctioned by the court, from which the juvenile was paroled, or for which the juvenile was place on probation.

## Table 2

For those juveniles whose committing offense as of May 4, 1994 was contempt of court, parole violation, or probation violation (as identified in Table 1), the following table summarizes the most serious offense for which the juvenile was originally sanctioned by the court, from which the juvenile was paroled, or for which the juvenile was placed on probation. This table was also compiled by the court from the May 4, 1994 Daily Roster of DJJ.

| Offense | Birchwood | John G. Richards | Willow Lane | Total |
|---|---|---|---|---|
| Accessory before the fact | 0 | 0 | 1 | 1 |
| Armed robbery | 1 | 0 | 1 | 2 |
| Assault (and battery) of a high and aggravated nature | 1 | 1 | 3 | 5 |
| Assault (and battery) with intent to kill | 0 | 0 | 2 | 2 |
| Assault on police officer while resisting arrest | 0 | 0 | 1 | 1 |
| Breaking into automobile or fuel tank | 0 | 1 | 0 | 1 |
| Burglary, first or second degree | 0 | 12 | 8 | 20 |
| Carrying pistol unlawfully | 2 | 2 | 2 | 6 |
| Carrying weapon on school grounds | 0 | 2 | 1 | 3 |
| Criminal conspiracy | 0 | 0 | 1 | 1 |
| Criminal domestic violence | 0 | 1 | 0 | 1 |
| Criminal sexual conduct | 3 | 0 | 0 | 3 |
| Criminal sexual conduct with a minor | 2 | 0 | 0 | 2 |
| Discharging firearm into dwelling | 0 | 1 | 0 | 1 |
| Disturbing schools | 0 | 0 | 1 | 1 |
| Grand larceny | 1 | 3 | 3 | 7 |
| Grand larceny, automobile | 0 | 3 | 1 | 4 |
| Lewd act | 1 | 0 | 0 | 1 |
| Lynching | 1 | 3 | 0 | 4 |
| Making bomb threat | 0 | 0 | 1 | 1 |
| Malicious injury to personal property | 0 | 0 | 2 | 2 |
| Malicious injury to real property | 0 | 1 | 0 | 1 |
| Petty larceny | 0 | 1 | 0 | 1 |
| Pointing firearm | 0 | 1 | 1 | 2 |
| Possession of LSD or cocaine | 0 | 1 | 0 | 1 |
| Possession of LSD or cocaine with intent to distribute | 0 | 2 | 0 | 2 |
| Possession of unlawful weapons | 0 | 1 | 0 | 1 |
| Possession with intent to distribute controlled substance in proximity of school | 0 | 1 | 0 | 1 |
| Resisting an officer | 0 | 0 | 1 | 1 |
| Runaway | 0 | 1 | 0 | 1 |
| Shoplifting | 0 | 2 | 0 | 2 |
| Simple assault (and battery) | 3 | 3 | 2 | 8 |
| Strong-arm robbery | 3 | 0 | 0 | 3 |
| Threatening school teacher | 0 | 1 | 0 | 1 |
| Truancy | 0 | 1 | 2 | 3 |
| Use of car without owner's consent | 0 | 0 | 1 | 1 |
| **Total Contempt, Parole, or Probation Violations** | **18** | **45** | **35** | **98** |

Table 3

**BIRTHS TO SINGLE MOTHERS**
(Percentage of all births 1950-91)

SOURCE: S.C. Department of Health and Environmental Control

Table 4

**Births to Unmarried Women
1940-1991**

r= 0.98
b= 0.04

• The data fits an exponential regression y=ae$^{bx}$
• The statistic "r", called the correlation coefficient, indicates how closely a particular regression line fits the data.
 The 0.98 correlation coefficient indicates an almost perfect fit.
• The statistic "b", called the slope, indicates how rapidly a line is rising or falling.